173 So. 115

**HELLO WORLD BROADCASTING COR-
PORATION v. INTERNATIONAL
BROADCASTING CORPORATION.**

No. 33957.

Feb. 1, 1937.

Rehearing Denied March 1, 1937.

Wilkinson, Lewis & Wilkinson, of Shreveport, and O'Connor & O'Connor, of New Orleans, for appellant.

Harry V. Booth, of Shreveport, for appellee.

LAND, Justice.

On May 24, 1933, plaintiff entered into a contract with defendant whereby the latter undertook to purchase from plaintiff Radio Station KWKH in Shreveport, La., for the sum of $50,000 cash.

By supplemental agreement of same date, defendant agreed to pay plaintiff, in addition to the $50,000 cash stipulated in the contract, "time on the station at our prevailing card rate to the amount of $5,000.-00." Tr., p. 25.

Plaintiff avers that one of the moving, principal causes of the agreement and contract of sale was the obligation on the part of both obligor and obligee to operate KWKH in the city of Shreveport, La., upon its licensed clear channel wave length of 850 kilocycles.

Plaintiff alleges that defendant, on or about June 4, 1934, violated the letter, terms, and conditions of its agreement and contract by entering into a contract and agreement with Loyola University Radio Station WWL, whereby defendant relinquished and assigned the clear channel wave length of KWKH on 850 kilocycles, and received in return the sum of $25,000 in cash, and an assigned frequency to go on the air on the wave length of 1,100 kilocycles full time, subject to the approval of the Federal Radio Commission.

It is further alleged by plaintiff that, for many years, Station KWKH had been duly granted a license by the Federal Radio

Commission to operate on a clear wave channel at 850 kilocycles, and did so continuously operate on that channel from the time the permit was first granted until the date of the sale; that a clear channel for a city the size of Shreveport and that community, with a nation wide coverage, had placed Shreveport and that community in radio facilities and prominence among the larger cities of the nation; and that a continuance of its original clear wave channel at 850 kilocycles and its operation on that frequency for the betterment of Shreveport and that community was the principal and controlling cause and consideration in the confection and execution of plaintiff's contract of sale with defendant.

Plaintiff finally alleges that an outright sale of Station KWKH, without a restriction as to the retention of its clear wave channel at 850 kilocycles, would have been worth an amount greatly in excess of $50,000, and that not less than the sum of $85,000 would have been accepted for such an outright sale, and claims damages for the violation of the contract in the sum of the difference between $50,000, paid to plaintiff by defendant, and the sum of $85,000, or the sum of $35,000.

Plaintiff also alleges that the supplemental contract of $5,000, as to "time on the station at our prevailing card rate," became and is a part of the original contract of sale by plaintiff to defendant of Radio Station KWKH; that plaintiff was to receive this advertising time on a clear channel upon an assigned frequency of 850 kilocycles at the prevailing card rate for advertising; that defendant had furnished plaintiff the advertising time upon the station to the amount of $2,250; but that by reason of the change in radio frequency to 1,100 kilocycles by the contract of defendant with Radio Station WWL the advertising value to have been received by plaintiff, under the supplemental contract, is valueless.

Plaintiff also alleges that damages in the additional sum of $2,750 are therefore due and owing to it.

The total claim of plaintiff for damages for violation of the contract is the sum of $37,500.

The jury returned a verdict in favor of plaintiff in the sum of $21,250, which included $18,500 for breach of defendant's alleged obligation to maintain the station on 850 kilocycles, and $2,750 for breach of defendant's supplemental agreement to furnish plaintiff advertising upon the same basis.

From the judgment rendered on this verdict, the defendant has appealed.

1. When the contract for the sale of Radio Station KWKH of Shreveport was entered into by plaintiff and defendant, and for some time prior thereto, Loyola University of New Orleans, La., operator of Radio Station WWL, had filed an application with the Federal Communications Commission at Washington, D. C., seeking to obtain a permit for full time operation on the wave length of 850 kilocycles, sharing at the time on this wave length with KWKH, which was being operated by plaintiff in Shreveport, La.

There were numerous other applications pending before the commission for the purpose of securing plaintiff's right to broadcast on 850 kilocycles.

Some time prior to the date of plaintiff's contract with defendant, a hearing was had before an examiner of the commission, who filed a report recommending that the application of Loyola University for the exclusive right to operate on 850 kilocycles be granted, and that Station KWKH be denied a renewal of its license to continue part time operation on this radio frequency. Tr., p. 20.

An appeal was taken from the findings of the Examiner direct to the Federal Radio Commission, and on September 15, 1933, some four months after the contract between plaintiff and defendant had been executed, the commission reversed the findings of the examiner and ordered that the license of KWKH of Shreveport be renewed and that the application of Loyola University for exclusive and full time operation on 850 kilocycles be denied. Tr., p. 20.

Accordingly, the Federal Radio Commission gave its approval to the contract between plaintiff and defendant and transferred the license of plaintiff, Hello World Broadcasting Corporation, to operate Station KWKH part time on 850 kilocycles, to defendant, International Broadcasting Corporation. Shortly after the decision of the Federal Radio Commission was promulgated, Loyola University took an appeal from the decision to the District Court of Appeals of the District of Columbia.

On or about June 4, 1934, during the pendency of the appeal in the District of Columbia, the International Broadcasting Corporation entered into an agreement with Loyola University, whereby defendant agreed to assign the clear channel wave length of KWKH to Station WWL, and in return for this relinquishment received from Loyola University, the operator of said station, $25,000 in cash. Tr., p. 21.

The agreement between these parties is annexed to and made a part of the petition, and a reference to that agreement indicates that it was entered into between defendant and Loyola for the purposes of compromising their differences with regard to the operations of KWKH and WWL on the 850 kilocycles wave length, and to terminate all differences of every kind existing between the parties. The New Orleans Station agreed to withdraw all appeals or protests filed by it before the Federal Radio Commission and to dismiss its appeal pending in the courts. The contract recites that it is made on condition that the Federal Radio Commission will approve the issuance of a license for full time operation to KWKH on a new wave length of 1,100 kilocycles, with directional antennae to be constructed in conformity with the requirements of the Commission. Tr., p. 27.

■ 2. Plaintiff avers that one of the moving, principal causes of the agreement and contract of sale *was the obligation on the part of both plaintiff and defendant to operate Radio Station KWKH in the City of Shreveport, La., on its licensed, clear channel of 850 kilocycles.*

Paragraph I of the contract states that:

"The buyer agrees to purchase and pay for the following described property:

"(a) Radio Broadcasting Station KW-KH complete as now being operated with 10,000 watts power on 850 kilocycles."

"(e) An assignment of all rights and interest in and to (as licensee) the permit issued by the Federal Radio Commission covering the right to KWKH as a radio broadcasting station to operate with a power of 10,000 watts on 850 kilocycles.

"Any and all other assignments of rights, permits or licenses necessary to enable the continued operation of said radio broadcasting station after the consummation of this sale."

It is clear that paragraph I of the contract merely identifies the thing sold by the foregoing description, and contains no agreement upon the part of defendant to continue the operation of Radio Station KWKH on 850 kilocycles for any definite or indefinite period of time. These are the properties and rights for which the buyer agreed to pay a consideration of $50,000 in cash, which plaintiff has received.

Paragraph II of the agreement obligates the seller to do all in its power to cause the Federal Radio Commission to issue a permit or license in favor of the buyer, "in order to give buyer the legal license and permit to continue the operation of said radio broadcasting station on the same power and frequency hereinbefore mentioned."

There is no reciprocal obligation imposed on the buyer to do all in its power to continue the operation of the station on 850 kilocycles for the seller's benefit.

Paragraphs VI and VII, like paragraph II, contain other stipulations made purely and simply for the benefit of the defendant.

These paragraphs read as follows:

"VI. After Buyer shall have actually received from the Federal Radio Commission, and any and all other necessary governmental or regulatory bodies, such permit or license as is necessary to enable Buyer to continue the operation of said Radio Broadcasting Station as it has heretofore operated, and after Seller has executed and delivered to Buyer a warranty deed covering good, valid and unencumbered title to all of the property described in Section I hereof, Buyer shall pay in cash to Seller the sum of Fifty Thousand ($50,000.00) Dollars."

"VII. If, for any reason, Buyer does not receive the necessary permit and license from the Federal Radio Commission to enable it to operate said Radio Station as heretofore operated, then this contract shall terminate without any liability, cost or responsibility to Buyer."

This obligation, like the obligation stated in paragraph II, is one imposed upon the seller for the benefit of the buyer. The only obligation imposed upon the buyer is to "pay in cash to the seller the sum of Fifty Thousand ($50,000.00) Dollars."

The foregoing paragraphs of the contract are clear and unambiguous and contain no agreement whatever obligating defendant to continue the operation of the station on 850 kilocycles for the benefit of plaintiff.

3. Nor does the letter of May 24, 1933, concerning advertising, addressed by T. G. Roberts as president of the defendant company to the Hello World Broadcasting Corporation, change in any wise the provisions of the contract itself.

As this letter was written without the knowledge or the approval of the board of directors of either corporation, it is questionable whether it was intended to be embodied in and made part of the contract itself; but conceding such to be the case, the letter does not, in any way, change the reciprocal obligations of the parties.

The letter reads as follows:

"Supplementing contract of purchase from you this date Radio Station KWKH and your assignment of your right and interest in and to frequency 850 kilocycles, we herein agree to pay you, provided said purchase is consummated as provided in said contract, in addition to the $50,000.00 cash stipulated in the contract, *time on the station at our prevailing card rate to the amount of $5,000.00.*

"The time we herein agree to give you on the station *is to be sold by you to reputable concerns for advertising purposes and subject to our acceptance.* Also, the time you sell is to be agreed upon between your customer, you and ourselves as said time will have to be allotted to fit in with the daily programs of the station." (Italics ours.)

We fail to find in either paragraph of the supplemental agreement any obligation or warranty upon the part of defendant that it will maintain the station on a frequency of 850 kilocycles, and no such warranty can be implied.

As stated in the first paragraph of this agreement, the advertising time to be sold is *"time on the station* at our pre-

vailing card rate to the amount of $5,-000.00."

The time stipulated was, therefore, time on the station and not time on 850 kilocycles, except in so far as the station might be operated on that frequency.

Our conclusion is that the contract, by its very terms, imposes no obligation on the defendant such as that contended for by plaintiff.

4. The resolutions adopted by both corporations approve the contract *as written,* and neither board indicated by its formal action that there should be any obligation on the defendant to maintain the station on any particular frequency. D-7. Tr., p. 116.

Such contention upon the part of plaintiff is, in our opinion, a pure afterthought, as the testimony of all the witnesses taken on the trial of the case indicates that no such obligation was ever discussed in the negotiations leading up to the consummation of the written contract. Testimony of Gammill; Testimony of Roberts, Tr., pp. 208, 294; Tr., pp. 305, 306; Tr., pp. 99-111.

Mr. Henderson testified that the letter which he wrote May 19, 1933, set forth the terms and conditions and considerations for which his company would agree to sell the station to the defendant. Letter, Tr., p. 109; Testimony of Henderson, Tr., pp. 412, 413.

We fail to find a single sentence in this letter to indicate that plaintiff would require defendant to continue to operate the station on any particular frequency.

Mr. Hunter testified that he did not agree for the International Broadcasting Corporation to obligate itself to operate on any particular frequency and, if such obligation had been written into the contract, he would not have approved it. Tr., p. 718.

Mr. Lewis, who acted as attorney for defendant and for Mr. Hunter, testified that the details of drawing up the contract and concluding the agreement were placed in his hands; that he had no knowledge of any such agreement; and that none was ever communicated to him. He likewise testified that he wou'd not have approved a contract with such a.. obligation written in it. Tr., pp. 571-573.

Mr. Roberts testified that no such obligation was ever assumed. Tr., pp, 271, 272.

Mr. Gammill, plaintiff's own witness, admits that he does not recall any discussion with Roberts on the subject. Tr., pp. 304, 305.

Mr. Guyton and Mr. Klein, who were directors and officers of defendant company, and together with Mr. Roberts, constituted the entire board of directors, likewise testified that they discussed the contract with Mr. Roberts, and that no such obligation was ever mentioned in any of their discussions on the subject. Tr., pp. 530–532, 547.

5. There is no testimony to show that defendant was apprised of the fact that plaintiff's moving consideration for the agreement was the alleged obligation to keep the station on 850 kilocycles, and there is no proof that defendant intended to so bind itself or agree to be so obligated. There is no evidence to show a mutual mistake by both parties in reducing it to writing.

It is elementary that plaintiff's right to reframe a contract for error or mistake must result from an error or mistake that is mutual. This rule of law is made clear in 13 C.J. p. 373, which reads as follows: "A mistake of one of the parties only in the expression of his agreement or as to the subject matter, not known to the other, does not affect its binding force, and is no ground for its rescission even in equity." See, also, Kirkland v. Edenborn, 140 La. 669, 73 So. 719.

Article 1826 of the Civil Code declares: "No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it."

The intent of the parties, in our opinion, is expressed in clear and unambiguous language. In such a case, a court will not resort to construction but will enforce the contract according to its terms. 13 C.J. 520.

6. The conduct of defendant in urging the citizens of Shreveport to do all in their power to save KWKH and have its license to operate renewed by the Federal Radio Commission cannot be considered as a practical construction of the contract, and cannot control the clear provisions of the instrument itself.

Such conduct by defendant could, at best, be construed only as a "promissory expression," and not as its intention or obligation to continue to operate Radio Station KWKH indefinitely on 850 kilocycles.

Defendant had made a contract to purchase the station and secure a renewal of the license. Defendant's effort to save the station merely evidenced its desire to carry through the contract.

■ Besides, this alleged "promissory expression" occurred some time after the contract between the parties was made. Obviously, it does not throw any light upon the obligations that the parties assumed on May 24, 1933, the date of the contract. "Statements of intention made to *third persons* cannot generally be considered as offers," or "promissory expressions." 13 C.J. 287. (Italics ours.)

The city of Shreveport is not a party to the contract. It is a third party.

7. Being under no obligation under its contract to continue indefinitely the operation of its Radio Station KWKH at Shreveport, La., at 850 kilocycles, defendant was at full liberty to enter into the sales contract with Radio Station WWL in the City of New Orleans, and to adjust its differences with that station without the consent or the approval of plaintiff.

■ 8. Plaintiff's whole case, then, is based on the allegation that advertising time on 1,100 kilocycles is "valueless."

The depositions of Father Burk and of Captain Pritchard, who operated Loyola

University on 850 kilocycles part time up until October 2, 1934, and since that time have operated the WWL Station full time, gave their unqualified opinions that full time operation on 1,100 kilocycles is of far greater value to the advertiser, the station owner, and the public than part time operation on 850 kilocycles. Tr., pp. 150, 151, 169.

Likewise, Mr. John McCormack, manager of Station KTBS for many years, and more recently of Station KWKH, Mr. Seapaugh, owner of Station KRMD, and Mr. Liner, who owns a station in Monroe, all testify and furnish reasons why the station operating full time on 1,100 kilocycles is far more valuable as an advertising agency than it was when operated part time on 850 kilocycles. Tr., pp. 631, 632; 552-556.

The value of the opinion of these witnesses is conclusively proven by the operations that defendant had on the station itself.

In October, 1933, defendant sold $435 worth of advertising time on 850 kilocycles, whereas in October, 1934, it sold approximately $5,500 worth of advertising while operating on 1,100 kilocycles. Tr., pp. 189, 711. In September, 1934, the month prior to the change in operations, defendant sold advertising time of a value approximating $1,250, whereas in October, 1934, immediately following the change in frequency, it sold advertising time of a value of approximately $5,500.

In November, 1934, the advertising time increased to approximately $6,000, and in December, 1934, it was in excess of $6,-

000. From October on, following the change in frequency, the net receipts of the station consistently improved whereas, prior to the change, the station was being operated at considerable loss. Tr., pp. 189, 711, 712. In September, 1934, there were 69 advertising customers on 850 kilocycles. Immediately following the change to 1,100 kilocycles on October 2d, the advertisers jumped to a total of 150, or an increase of 81, more than 120 per cent.

The plaintiff has not alleged, nor has it proved, that a single advertiser or prospective advertiser ever refused to use the station because of change in wave length. Mr. Henderson testifies that he didn't wish to sell time on the changed wave length and that he didn't try. Tr., pp. 391, 392.

Plaintiff has proven no damages whatever from change in wave length.

9. Plaintiff's interest in prosecuting this litigation and its claim for damages in this suit is thus stated in paragraphs II–C and II–D of its supplemental and amended petition, filed April 17, 1935, which is quoted as follows:

"II–C That the interest about which your petitioner alleged upon in its original petition was the personal and actual interest of it, through its president, W. K. Henderson, and other officers, in maintaining for the City of Shreveport the advantages that would flow to its citizens by continuing Station KWKH on its original frequency and clear wave channel, thus to hold and to foster the nation-wide recognition of this city and community before the American people." Tr., p. 39.

"II–D That to the citizenry in Shreveport and this territory, and in fact to the radio world throughout these United States, the name Hello World Broadcasting Corporation was synonymous with W. K. Henderson, and that the said W. K. Henderson and other officers of the Hello World Corporation had lived throughout their entire lives in Shreveport and this community and expected to continue to so live and reside after the confection of said sales contract, *and that it was the interest and desire of your petitioner to leave as a heritage to this community* the assets, advantages and lasting benefits to come from the retention of KWKH on its original assigned frequency and clear wave channel." Tr., p. 40. (Italics ours.)

The plaintiff corporation is not now, and has not been, in the radio business since September 15, 1933, when it delivered Station KWKH to defendant.

Its president, Mr. W. K. Henderson, testified on the trial of the case that, in selling this station, it was the intent of the company to go out of the radio business and to dissolve, and to liquidate its affairs. Tr., p. 436.

It clearly appears, therefore, that plaintiff's only interest is to penalize defendant for its alleged failure to carry out a promise made in the interest of all the citizens of Shreveport and of the United States of America.

█ It is well settled that one citizen has no right to champion the cause of a community where his interest in the matter is no different from that of any other citizen. For this reason, plaintiff

had no right to bring this suit. Morris v. Municipal Gas Co., 121 La. 1016, 46 So. 1001; Black v. New Orleans Ry. & Light Co., 145 La. 180, 82 So. 81.

The plaintiff, therefore, has failed to make out a case, either for damages for the alleged breach of the contract to operate the station on 850 kilocycles, or for the alleged loss in advertising time under the supplemental agreement.

Our conclusion is that the jury manifestly erred in its application of the law, as well as the evidence, and accordingly its verdict should be set aside.

It is therefore ordered that the verdict of the jury returned in this case be set aside; that the judgment rendered on this verdict, and appealed from, be annulled and reversed; and that plaintiff's demand be rejected and plaintiff's suit dismissed at its costs.