REYNAUD v. BULLOCK et al.

No. 35517.

Feb. 5, 1940.

On Rehearing April 29, 1940.

Herold, Cousin & Herold, of Shreveport, and Jacob S. Landry, of New Iberia, for appellant.

McCoy & King, of Lake Charles, and Walter J. Burke, of New Iberia, for appellees.

ROGERS, Justice.

The question presented on this appeal is whether plaintiff is entitled to a one-sixteenth instead of a one-thirty-second royalty on the oil produced from 58 acres of land situated in the Little Bayou Oil Field in the Parish of Iberia.

The record shows that, in the year 1912, the plaintiff Hector F. Reynaud, acquired 58 acres of swamp or low land in the Parish of Iberia. On October 16, 1916, plaintiff executed a mineral lease covering the land to Gorge J. Sabatier. On December 6, 1916, plaintiff sold to Arthur Schexnayder an undivided one-fifth interest in the minerals underlying the property. On March 2, 1917, plaintiff sold to J. W. Gardiner and C. O. Noble an undivided one-half interest in

the land, including the minerals. Schexnayder joined in this deed to divest himself of any interest he might have in the undivided one-half interest transferred to Gardiner and Noble, stating that he and the plaintiff had entered into a separate agreement amending the terms of their original contract. Subsequently, Gardiner sold his interest in the land to H. C. Hanszen. In the collateral agreement entered into between Schexnayder and the plaintiff Reynaud, it was stipulated that in lieu of their original agreement, Schexnayder was to receive only one per cent of the royalty due Reynaud under the Sabatier lease. On February 25, 1922, Gardiner and Noble, together with plaintiff, executed an oil and gas lease to H. S. Sealy. This lease was for a primary term of three years and it provided that if the lessors owned a less interest than the entire fee, the royalty should be paid to the lessors "in proportion which lessor's interest bears to the whole and undivided fee." On March 1, 1922, Schexnayder ratified this lease, plaintiff agreeing that Schexnayder's royalties were to be paid direct to him.

The next transaction, which is the one directly involved in this suit, was a sale executed by plaintiff to C. W. Wolke. This sale was executed on March 24, 1927. Wolke was acting for F. N. Bullock to whom he transferred the property which he acquired from plaintiff. Later Bullock sold and donated to his wife, Laura Jacobs Bullock, the rights he had acquired from Wolke.

On December 22, 1933, Hanszen, the vendee of Gardiner, Noble and F. N. Bullock granted an oil and gas lease on the property to C. A. Richardson. The lessee, Richardson, assigned the lease to the Texas Company, which drilled a well on the property. This well became a producer some time in the month of March, 1936. From that date up through September, 1938, the well produced 1,523,621.87 barrels of oil, of a value of $1,680,611.42. Of this amount The Texas Company is holding in suspense, awaiting the final disposition of this suit, the sum of $50,588.19, representing a one-thirty-second royalty interest.

After the completion of the first well, plaintiff brought this suit, impleading as defendants, C. W. Wolke, F. N. Bullock, Laura J. Bullock, and The Texas Company. Plaintiff prayed for judgment decreeing him to be entitled to a one-sixteenth royalty of all the oil, gas and other minerals produced from the 58 acres of land described in the petition, or in the alternative, that the instrument on which this claim is based, be reformed so as to grant plaintiff that relief. After defendants had answered, the case was fixed for trial and, on the date of the trial, defendants filed and re-urged exceptions of no right or cause of action, which were referred to the merits. The case was then tried on the merits and resulted in a judgment decreeing that plaintiff was entitled to receive a one-thirty-second royalty on the oil produced from the land, and ordering The Texas Company to pay defendants the $50,588.19, which that company was holding subject to the outcome of this litigation, and to make all future payments to defend-

ants accordingly. Plaintiff has appealed from the judgment.

The instrument, which the court is called upon to review in this case, is the deed that plaintiff executed in favor of Wolke on March 22, 1927.

Plaintiff assigns as error here, first, that the trial judge erred in construing the deed as written so as to give plaintiff a one-thirty-second instead of a one-sixteenth royalty; and second, that the trial judge erred in failing to pass on plaintiff's alternative demand to reform the deed so as to make it express the true intention of the parties, that plaintiff was to receive a one-sixteenth royalty.

The primary question to be disposed of arises under plaintiff's contention that the trial judge erred in construing the language of the deed which is the subject matter of this litigation. The part of the deed describing what was sold by Reynaud to Wolke and what was reserved by Reynaud reads as follows:

"The undivided one-half of that certain tract of land situated at Little Bayou, Iberia Parish, State of Louisiana, measuring Fifty Eight (58) acres in superficial area and Bounded North by land of Schwing and Sealey et als; South by land of Seth C. Sumeral formerly; East by Gulf Refining Company of Louisiana fee tract and west by land of A. A. Bernard et als.

"It is, however, distinctly understood and agreed the vendor reserves unto himself, his heirs and assigns in perpetuity a one-sixteenth (1/16) royalty of all the oil, gas and minerals produced and saved from said premises and a royalty of twenty five cents per ton for all salt and sulphur mined and marketed off said lands herein transferred; said royalty to be delivered to the vendor or assigns, free of costs of production and said royalty shall be paid to the said vendor, heirs or assigns in the proportion that his ownership is of the whole tract above described. And it is further declared that the said C. W. Wolke, vendee, having this day acquired from Arthur Schexnayder by act passed before undersigned Notary Public, all of his rights, titles and interest in and to all the minerals, including oil, gas, salt, sulphur, and other minerals owned by him as acquired by him from the vendor H. F. Reynaud and effecting the property herein transferred, that a similar royalty as above provided shall be paid to the H. F. Reynaud, his heirs and assigns in the proportion of said ownership as acquired by said Wolke from said Schexnayder—It being understood that the total royalty to be paid to said H. F. Reynaud, his heirs and assigns is fixed at one-sixteenth (1/16) based upon an ownership of an undivided half interest in the property hereinabove described.

"Should said property above described be partitioned in kindly, then and in that case the royalty due said H. F. Reynaud, his heirs and assigns shall be one-sixteenth on the share allotted to the said C. W. Wolke or assigns and a royalty of twenty five cents per ton for salt and sulphur on said allotted share."

The deed, of course, should be construed as a whole in order to arrive at the intent of the parties. This rule is laid down by Article 1955 of the Civil Code which says that "all clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act." See Bremer v. Lane, 185 La. 543, 169 So. 568; Gibson v. Zylks, 186 La. 1043, 173 So. 757.

According to the recitals of the deed, Reynaud sold to Wolke an undivided one-half of a tract of land measuring 58 acres in superficial area, the sale being made with certain reservations. These reservations for convenient reference are set out in five clauses in the briefs filed on behalf of the parties, and we shall follow the same procedure in analyzing the instrument and in disposing of the primary issue raised in the case.

The first clause, appearing in numerical order in the briefs of counsel for the respective parties, reads as follows:

"It is, however, distinctly understood and agreed the vendor reserves unto himself, his heirs and assigns in perpetuity a one-sixteenth (1/16) royalty of all the oil, gas and minerals produced and saved from said premises and a royalty of twenty five cents per ton for all salt and sulphur mined and marketed off said lands herein transferred * * *."

It will appear from this clause that plaintiff reserved to himself a one-sixteenth of all the oil, gas and minerals produced and saved from the premises and a royalty of twenty-five cents per ton for all salt and sulphur mined and marketed off the lands transferred.

On behalf of plaintiff, it is argued that the words "said premises" refer to the entire tract of 58 acres. On behalf of the defendants, it is argued that those words refer to the undivided one-half of the 58-acre tract.

In the discussion of the meaning of the word "premises," counsel for plaintiff cite a number of cases which hold, generally, that the term is commonly used as comprising land, houses and other matter. On the other hand, counsel for defendants cite a number of cases collected and referred to in Words and Phrases, Volume 6, First Series, page 5509, in which the word "premises" is defined as follows:

" 'Premises,' in an instrument of writing, implies a reference to previous matter contained therein and concerning which something is proposed. * * *

"The technical meaning of the word 'premises' in a deed is all that precedes the habendum. * * *"

In the case of Liles v. Pitts, 145 La. 650, 82 So. 735, 738, the court was called upon to construe a deed in which the vendors sold "all their right, title, and interest" in a certain tract of land. This recital was followed by the further recital in the deed that "at the time of the delivery hereof" the vendors were the lawful owners of the "premises above granted." The vendees contended that the word "premises" meant "all the land that had been described above," but this court held that the word meant the thing that was sold, which was

a two-thirds interest in the land. This holding is peculiarly applicable to the issue involved in this case.

According to the first reference to any reservation in the deed from Reynaud to Wolke, Reynaud reserved a one-sixteenth royalty of all the oil, gas and minerals produced from a one-half interest in the land that was sold, which was all Reynaud owned and which was the "premises" sold. The word "premises" appears in the deed only once and that appearance is in connection with the disposition of the thing sold. This, as stated, was only a one-half interest in the land, because that is all Reynaud owned and could have sold at the time. If what Reynaud reserved was a one-sixteenth interest in a half interest only, it is clear that he reserved only a one-thirty-second of the whole. The language of this clause seems to be clear in itself, but the amended deed executed by Reynaud and Schexnayder makes it even clearer that Reynaud considered that if and when oil was produced from the land, it would be divided into halves,—one-half to go to the Gardiner and Noble ownership in the whole tract, and the other half to the Reynaud and Schexnayder ownership in the whole tract, and that Reynaud was reserving and was to receive a one-sixteenth royalty only from the Reynaud and Schexnayder ownership of one-half of the tract.

The clause, which has been numbered 2 in the briefs of counsel, reads as follows:

"Said royalty shall be paid to the said vendor, heirs or assigns in the proportion that his ownership is of the whole tract above described."

This clause clearly sets forth that Reynaud is to receive only a certain proportion of the one-sixteenth royalty, predicated on the proportion of his ownership in the whole tract as described in the deed. Prior to the time Reynaud had executed the deed to Wolke, he had sold one-half of the tract, including the minerals, to Gardiner and Noble; hence, at the time of the Wolke sale, Reynaud owned only one-half of the tract which was the thing that he sold to Wolke. In other words, the agreement under this clause was that Reynaud was to get the same proportion or share of the one-sixteenth royalty that he owned in the whole tract. Since he owned only one-half of the tract, under the wording of this clause the clear intention of the parties was that he was to receive one-half of the one-sixteenth royalty, or one-thirty-second of the whole, and Wolke, or his assigns, was to receive the other half of the one-sixteenth royalty, or one-thirty-second of the whole.

There is no conflict between Clause No. 1 and Clause No. 2. On the contrary, both clauses lead to the logical conclusion that what Reynaud reserved was a share of the one-sixteenth royalty, which share was the same as his share in the ownership of the whole tract. As he owned only one-half of the whole tract, he necessarily reserved only one-half of the one-sixteenth, which would be a one-thirty-second of the whole production.

Clause No. 3 in the deed embraces a further explanation of what Reynaud's

reservation meant. This clause reads as follows:

"And it is further declared that the said. C. W. Wolke, vendee, having this day acquired from Arthur Schexnayder by act passed before undersigned Notary Public, all of his rights, titles and interest in and to all the minerals, including oil, gas, salt, sulphur and other minerals owned by him as acquired by him from the vendor, H. F. Reynaud and affecting the property herein transferred, that a similar royalty as above provided shall be paid to the H. F. Reynaud, his heirs and assigns, in the proportion of said ownership as acquired by said Wolke from said Schexnayder."

The clause shows that Wolke had, on the same day, purchased Schexnayder's interest in the minerals which was originally one-fifth of the whole but was, by a later instrument, changed to two-tenths of the one-half that Reynaud retained in selling the other one-half to Gardiner and Noble. The clause further declares that a similar royalty, as above provided, should be paid to Reynaud in proportion to the interest in the minerals acquired by Wolke from Schexnayder. This stipulation is clearly a recognition by Reynaud that Schexnayder owned a two-tenths interest in the one-half ownership of the minerals. Furthermore, its effect is to make certain that Reynaud should receive a similar, or the same, royalty out of the interest that Wolke acquired from Schexnayder as he would receive out of his own interest. In other words, at the time the deed to Wolke was executed, Gardiner and Noble owned one-half of the minerals and Reynaud owned the other one-half, less the two-tenths of the one-half he had sold to Schexnayder, and as Wolke had that day acquired the Schexnayder interest, Reynaud apparently desired to make certain that he would obtain a royalty out of the Schexnayder interest similar to the royalty he would obtain out of his own interest. According to the reservation contained in this clause, Reynaud was to receive from the Schexnayder interest a one-sixteenth of the two-tenths of one-half, which would be a $\frac{1}{160}$ which, added to the one-sixteenth of his own eight-tenths of one-half, or $\frac{4}{160}$, would make a total of $\frac{5}{160}$, which is one-thirty-second of the whole.

According to the wording of the clause, Reynaud was reserving a one-thirty-second of the whole, whether it came from his interest, or from the total of his own and the Schexnayder interest. Thus, Reynaud was assured that he would receive a one-sixteenth royalty on everything but the one-half interest owned by Gardiner and Noble.

It appears from the record that the sale of one-half interest in the whole tract by Reynaud to Gardiner and Noble was made for a cash consideration of $8,500 and that Schexnayder received $850, which was one-tenth of the consideration received by Reynaud. In the written agreement between Reynaud and Schexnayder, the original sale from Reynaud to Schexnayder for the one-fifth interest in the minerals under the whole tract of land was cancelled and in lieu thereof and as a result of Schexnayder having received $850, for his one-fifth interest in the minerals under the one-half of

the tract of land sold to Gardiner and Noble, Schexnayder retained his two-tenths interest in the minerals under the one-half of the tract of land still held by Reynaud.

Clause No. 4 reads as follows:

"It being understood that the total royalty to be paid to said H. F. Reynaud, his heirs and assigns is fixed at one-sixteenth (¹⁄₁₆) based upon an ownership of an undivided half interest in the property hereinabove described."

This clause again appears to explain the intention of the contracting parties. In unambiguous language, it declares that the total royalty Reynaud was reserving was based upon the ownership of a one-half interest in the property, not the premises, described in the deed. This declaration clearly means that the basis upon which the one-sixteenth royalty was to be calculated was a one-half interest in the whole property, or a one-thirty-second interest of the whole. The clause simply states, in different words, what is set forth in the other clauses of the deed.

The fifth or final clause is in the following words:

"Should said property above described be partitioned in kindly (kind), then and in that case the royalty due H. F. Reynaud, his heirs and assigns shall be one-sixteenth on the share allotted to the said C. W. Wolke or assigns and a royalty of twenty five cents per ton for salt and sulphur on said allotted share."

Counsel for plaintiff state in their brief that this is the clause "which causes the trouble." Counsel for defendants contend that this clause sums up the intention of the parties. Counsel for plaintiff contend that the clause has only a remote application, because the condition provided for therein has never happened and that such remote application is inconsistent with the prior clauses which were written for the sole purpose of fixing the royalty payable to plaintiff. But this clause is wholly consistent with the preceding clauses. The clause plainly states that if the property should be divided in kind, Reynaud would receive one-sixteenth royalty on the minerals produced from the particular one-half interest in the tract of land that was acquired by Wolke. This statement supports the defendants' theory concerning the prior clauses in the deed, which is that Reynaud was to get one-sixteenth of the one-half of the minerals that might accrue to the person who owned a one-half interest in the property. The prior clauses explain what Reynaud was reserving when the land was only theoretically divided, as was done when plaintiff, Schexnayder, and Gardiner and Noble executed the instruments dated March 2, 1917. But to explain how the royalty should be divided in case the whole tract of land should ever be partitioned in kind, the parties incorporated Clause No. 5 in their agreement. We do not think any construction can be placed on the agreement of the parties as contained in the fifth clause of their contract except that plaintiff was to receive the one-sixteenth royalty on the minerals that might be produced from the one-half of the property which plaintiff sold to Wolke, which would be, as we have heretofore said, a

royalty of one-thirty-second of all minerals produced from both halves, or the whole tract of land.

 The instrument under review is clear on its face and may be construed under its own terms and conditions without the aid of any extraneous evidence. Applying the rule of interpretation laid down by Article 1955 of the Civil Code hereinabove referred to, we find that there is no inconsistency between any of its provisions covering the mineral reservation. Each of those provisions harmonizes with the other related provisions. Having so found, it becomes unnecessary for us to discuss plaintiff's alternative demand for the reformation of the instrument.

For the reasons assigned, the judgment appealed from is affirmed.

## On Rehearing.

FOURNET, Justice.

Plaintiff instituted this suit to have the reservation of a certain mineral royalty interest in the deed executed by him on March 24, 1927, transferring his undivided half interest in a 58-acre tract of land located in the Little Bayou Oil Field in Iberia Parish to C. W. Wolke, an interposed party for C. N. Bullock, construed so as to entitle him to 1/16th of all of the oil and gas produced from the entire tract of land instead of 1/32nd, as contended for by the defendant C. N. Bullock and his assignees, Laura Jacobs Bullock and F. W. Bennett, and also to recover $50,588.19 impounded by the lessee of the property, The Texas Company, awaiting the outcome of this suit. In the alternative it is contended by the plaintiff that the instrument should be reformed so as to reflect the true intention of the parties by providing that plaintiff is entitled to a 1/16th royalty interest, should the court decree that the reservation only provides for a 1/32nd.

In our decree of February 5, 1940, we affirmed the judgment of the lower court construing the provisions in the deed as contended for by the defendants and dismissing plaintiff's suit. Plaintiff, in his application for a rehearing, called our attention to the fact that we had failed to pass on his alternative demand and we therefore granted him a rehearing, but limited the same to that demand.

 It is an established rule of law in our jurisprudence that "Either party is always permitted, in a suit between the parties to a contract, to correct any error in the instrument purporting to evidence the contract, so as to make it express truly and correctly the intention of the parties," (State v. Standard Oil Company of Louisiana, 164 La. 334, 354, 113 So. 867, the cases therein cited, and Fair v. Williams, 187 La. 953, 175 So. 631) provided the rights of third parties have not intervened. Sentell v. Randolph, 52 La. Ann. 52, 26 So. 797; Adams v. Drews, 110 La. 456, 34 So. 602; Bender v. Chew, 129 La. 849, 56 So. 1023; Frantom v. Nelson, 142 La. 850, 77 So. 767; Giovanovich v. Breda's Widow and Heirs, 149 La. 402, 89 So. 251; Waller v. Colvin, 151 La. 765, 92 So. 328; 12 American Jurisprudence 631, Section 138; Williston

on Contracts, Revised Edition, Volume 5, Section 1585, page 4423; 23 Ruling Case Law 333, Sections 25 and 27; 53 Corpus Juris 908, 935, 936, and 962. The error or mistake must be mutual. Hello World Broadcasting Corp. v. International Broadcasting Corp., 186 La. 589, 173 So. 115; Crowell & Spencer Lumber Co. v. Hawkins, 189 La. 18, 179 So. 21; Topps v. North British & Mercantile Ins. Co., La. App., 148 So. 470; 13 Corpus Juris 373, Section 254; 13 Corpus Juris 520, Section 481; 53 Corpus Juris 941, Sections 59 and 60; 23 Ruling Case Law 327, Section 20; 12 American Jurisprudence 624, 625, Section 133; and Article 1826, Revised Civil Code. The burden is on the one seeking the reformation to prove the error (Metcalfe v. Green, 140 La. 950, 74 So. 261; White v. Myane, 10 La.App. 195, 120 So. 650; Crais v. Castaing, 13 La.App., 395, 128 So. 300; Coussons v. Smythe, La.App., 178 So. 657), and he must carry the burden by clear, and the strongest possible, proof. Palangue v. Guesnon, 15 La. 311; Dickson v. Dickson, 36 La.Ann. 870; Ker v. Evershed, 41 La. Ann. 15, 6 So. 566; Bryan v. Wisner, 44 La.Ann. 832, 11 So. 290; Gladdish v. Godchaux, 46 La.Ann. 1571, 16 So. 451; Chaffe v. Minden Lumber Co., 118 La. 753, 43 So. 397; Waller v. Colvin, 151 La. 765, 92 So. 328; and Nelson, Curtis & Nelson v. Bridgeman, 152 La. 190, 92 So. 855.

It was held in the case of Nelson, Curtis & Nelson v. Bridgeman, 152 La. 190, 92 So. 855, 860, that: "* * * a strong presumption obtains that the deed, as executed, properly describes and conveys all of the land intended to be conveyed. * * * the evidence [of an omission or error] * * * must be clear and convincing * * *." (Brackets ours.)

Having reached the conclusion in our original decree, which is now final, that the reservation in the deed provides for the payment to the plaintiff of a 1/32nd of all of the oil and gas produced from the entire tract of land, we now have for consideration the question of whether or not the plaintiff has borne the burden of proof on his alternative demand, i. e., that the instrument does not reflect the true intention of the parties thereto.

On this point the testimony of the plaintiff and that of the defendant Bennett, who, as the agent of Bullock, consummated the transaction, is diametrically opposite. The plaintiff states positively that he intended to "sell the surface rights and to retain all of (his) royalty," which he describes as a full 1/16th out of the entire production of the property, while Bennett states that plaintiff reserved "a 1/16th of the oil and gas produced from said 1/2 interest, or a 1/32 of the oil and gas produced from the full interest of the tract." In other words, Bennett's testimony is that, according to their agreement, on the basis of the customary 1/8th royalty, the plaintiff and Bullock were to share the oil, gas, and other minerals produced and apportioned equally.

Plaintiff summoned as a witness the notary who prepared the papers and he (the notary) stated that, while he recognized the act in question as having been prepared in his office, he only recalled one or two of the incidents leading up to the transaction,

one being the plaintiff telling him "at that time that his intention was to reserve a ⅟₁₆ royalty and that he wanted to submit the matter to Mr. Burke [Mr. Porteous Burke, plaintiff's attorney] before signing it." (Brackets ours.)

There is also in the record the testimony of F. L. Alderson who testified that some time prior to the purchase of the property by Bennett, plaintiff had offered to sell him (Alderson) the entire half interest in the property (including the mineral interest) for a sum less than $5,000. He also said that he subsequently met the plaintiff in the Frederick Hotel in New Iberia and that the plaintiff told him he (the plaintiff) had sold the property, and that in selling it he had retained a half of the royalty he originally possessed. The plaintiff admits having had the conversation with Alderson, as testified to by him, but denies having stated that he had reserved only a half of the royalty he formerly owned. The plaintiff further challenges the value of Alderson's testimony because of the fact that Alderson, under cross-examination, admitted he was very friendly with an attorney of the defendants who had visited him regularly while he was in a hospital in Texas, and also because of the fact that on cross-examination Alderson, while pretending to remember this incident which occurred more than ten years prior to the trial of this case, failed to remember incidents connected with transactions of very recent origin in which he (Alderson) was personally interested.

Plaintiff strenuously urges that the defendants themselves interpreted this reservation to mean what he contends in a deed whereby Bullock assigned an interest in the property to Bennett. Reading that document in connection with the instrument in controversy, and taking into consideration the entire evidence, we are of the opinion that the plaintiff has not established by clear and convincing evidence that it was the intention of the plaintiff to sell and the intention of the defendant to acquire an undivided half interest in the 58-acre tract of land, reserving to the plaintiff a full ⅟₁₆th of all of the oil and gas produced from the entire tract, being a half of the usual ⅛th royalty, in effect reserving to himself all of the mineral interest that he had prior to the transaction.

We are fortified in this view because of the fact that the 58-acre tract of land is low and swampy, impossible of cultivation, and practically worthless except for its mineral potentialities. It is revealed by the evidence that the plaintiff acquired the property in 1912 from Antonino Canzaiere for $187, or slightly more than $3 an acre, and that at the time of the trial of this case the surface value thereof was between $7.50 and $10 an acre. It is inconceivable to us that the defendant Bullock would pay $3,500 for the mere surface rights to this property, as testified to by the plaintiff, when it was worth very little, and, in addition thereto, would pay $550, an amount in excess of the actual value of the surface right to the property, to Arthur Schexnayder for the outstanding royalty interest, in order to give the plaintiff a full ⅟₁₆th royalty in the gas and oil produced from the entire tract of land.

For the reasons assigned, the plaintiff's alternative demand is denied and our original decree affirming the judgment of the lower court is made final at appellant's cost.

O'NIELL, C. J., and PONDER, J., take no part.