239 So.2d 400 (1970)
HUMBLE OIL & REFINING COMPANY, Plaintiff and Appellee,
v.
P. J. CHAPPUIS, II, et al., Defendants and Appellants.
No. 3171.
Court of Appeal of Louisiana, Third Circuit.
August 27, 1970.
Rehearing Denied September 29, 1970.
Writ Refused November 9, 1970.
*401 Domengeaux, Wright & Bienvenu, by Mark Bienvenu, Lafayette, and P. J. Chappuis, II, Crowley, for defendants-appellants.
Milling, Saal, Sanders, Benson & Woodward, by H. H. Hillyer, Jr., John McCollam and Herschel Haag, III, New Orleans, Edwards, Edwards & Broadhurst, by Nolan J. Edwards, Crowley, Bernard J. Caillouett and Edward de la Garza, New Orleans, for plaintiff-appellee.
Before FRUGÉ, SAVOY and CULPEPPER, JJ.
CULPEPPER, Judge.
The plaintiff, Humble Oil & Refining Company, seeks to rescind or, alternatively, reform an instrument whereby it released an oil, gas and mineral lease. Defendants, P. J. Chappuis, II, et al., are the lessors in the lease which Humble contends was released through error of fact. The district judge rescinded the release. Defendants appealed.
There is little dispute as to the facts. The substantial issue is whether, on the facts shown, our law supports Humble's request to rescind or reform the release.
GENERAL FACTS
On April 23, 1957, the defendants granted to Humble an oil, gas and mineral lease *402 covering certain land in Acadia Parish. By December 1, 1965, portions of the Chappuis lease had been included in three producing units. Nod 1, Reservoir I, Sand Unit A encompassed 20.40 acres of the Chappuis tract, Nod 1, Reservoir H, Sand Unit A encompassed 76.40 acres of the Chappuis tract, and Nod 1, Reservoir H, Sand Unit B encompassed 65.01 acres of the Chappuis tract. On June 19, 1966, C. A. Morrow Well No. 1, the unit well for Nod 1, Reservoir I, Sand Unit A, ceased production. The other two unit wells continued to produce.
The lease contained a provision for cancellation as to any acreage which ceased to produce, unless reworking or additional drilling operations were commenced within 90 days. In this instance, Humble chose not to attempt to restore production. Consequently, on September 17, 1966 the Humble-Chappuis lease expired as to the 20.40 acres contributing to the nonproducing unit. However, the lease did not expire as to the acreage encompassed by the two units which continued to produce.
After Humble failed to restore production, Mr. Cliff Morrow, on whose father's land the defunct well was located, requested Humble's land office in Lafayette, Louisiana, to furnish him with an instrument of release of the expired leases. Mr. Cliff Morrow had also acted as lease broker in obtaining for Humble the Chappuis and other leases and hence he requested releases for all of the leases which had expired under their own terms as a result of the cessation of production from the Morrow well.
Humble's land office in Lafayette relayed Mr. Morrow's request to the Lease Records And Rentals Section of Humble in New Orleans, Louisiana. The Lease Records And Rentals Section prepared an instrument dated September 26, 1966, releasing approximately 27 oil, gas and mineral leases, including the Chappuis lease in its entirety. The instrument was then forwarded to Mr. Cliff Morrow who recorded it in the Conveyance Records of Acadia Parish.
Shortly after the release had been filed of record, Humble discovered that of the 27 leases which had been released in their entirety, eight, including the Chappuis lease, covered acreage in the two units which were still producing. Corrective instruments were signed by all of the lessors in the eight leases except the Chappuis family, who refused.
Experts testified the lease interests in the two producing wells released by Humble to the Chappuis family have a value of $1,792,527.
CIRCUMSTANCES GIVING RISE TO THE ERROR
The error began with Mr. James H. Spence, a lease analyst in Humble's Lease Records And Rentals Section. The general function of this office is to see that all leases are maintained either by rental payments or advising other departments of their obligations to keep the leases alive by production, reworking, drilling, etc. They keep a Rental Control Book, which is an index showing the name and number of each lease and the month during which any rental or other obligation becomes due. In addition to this general index, Lease Rental Sheets on each lease are kept in books by months showing more detailed information. Of course, there is also a separate lease file on each lease.
Mr. Spence received notice from the production department that the C. A. Morrow Well No. 1 had ceased production on June 19, 1966. He prepared a Special Drill Sheet for each of Humble's leases which contributed to the acreage of the nonproducing unit. The Special Drill Sheet for the Chappuis lease showed that the primary term of the lease had expired and the acreage included within the nonproducing unit would be lost unless reworking or additional drilling operations were commenced by September 17, 1966.
*403 This information went to the production department.
In September of 1966, Mr. Spence was informed by the production department that no reworking or drilling operations were contemplated. He then placed a red "R" on each of the Special Drill Sheets which he had previously prepared. The red "R" on the Special Drill Sheets was an erroneous entry under the system used by Humble. That symbol is used only to indicate that a lease has expired in its entirety. It is not used when the lease has only partially expired. Mr. Spence testified he intentionally placed the red "R" on the Special Drill Sheet, but he thought a special notation written by him at the bottom of the drill sheet would inform other employees that the lease had not expired in its entirety but had only expired as to that part located in the nonproducing unit. This notation on the bottom of the Special Drill Sheet reads as follows:
"Nod I RI SU A; C. Morrow Well No. 1 ceased producing June 19, 1966. Lease provides for 90 days continuous development. Therefore, UNLESS ADDITIONAL DRILLING OR REWORKING OPERATIONS ARE COMMENCED ON OR BEFORE September 17, 1966, unit acreage contributed by this lease to the unit captioned will expire."
Miss Linda Wells is a secretary in the Lease Records And Rentals Section. One of her duties is to review the Monthly Rental Books and remove therefrom the rental sheets or special drill sheets which have been previously marked with a red "R" by a lease analyst. On September 16, 1966, she found that the special drill sheet for the Chappuis lease had been marked with a red "R". She removed the sheet from the book and drew a red line through the Chappuis lease entry on the Rental Control Book. The purpose of the red line in the control book is to show that the lease has expired in its entirety. Miss Wells also stamped the individual Chappuis lease file with a red "Cancelled" stamp. Thus, by September 17, 1966, all of Humble's pertinent records on the Chappuis lease reflected that the lease had expired in its entirety.
It was three days after these erroneous notations were made by Miss Wells that Mr. Cliff Morrow requested the land office in Lafayette to furnish him with releases of all leases or parts thereof contributing to the acreage of the nonproducing unit. Mr. Morrow testified he intended to obtain releases of only those portions of the leases which had expired as a result of cessation of production. The land office in Lafayette forwarded Mr. Morrow's request to Humble's Lease Records And Rentals Section in New Orleans by letter dated September 19, 1966.
The letter requesting the releases was received by the Lease Records And Rentals Section in New Orleans on September 21, 1966. Mr. William Keiser, Jr., a clerk in that office, referred to the appropriate records and saw the red lines which had been drawn by Miss Wells on the Rental Control Book. He concluded that the Chappuis lease and about 30 other leases so marked had expired in their entirety. He pulled the pertinent files and routed Morrow's request to a lease analyst, Mr. Percy Saint, for preparation of the release.
Mr. Saint testified he saw that the Special Drill Sheets had been marked with the red "R" and initialed by Mr. Spence, a red line had been drawn through the leases on the Rental Control Book, and the individual lease files had been stamped "CANCELLED". This satisfied Mr. Saint that all pertinent documents reflected the leases had expired in their entirety. He instructed his stenographer to prepare the release.
The instrument of release was then presented to Mr. Claude L. Matthews, assistant supervisor of the Lease Records And Rentals Section for the Southeastern United States. This office supervises approximately *404 17,000 leases. Time does not permit Mr. Matthews to personally check each instrument. He relied on Mr. Saint's initials and signed the release without reading it. It was then forwarded to Mr. Cliff Morrow who recorded it in the Conveyance Records of Acadia Parish.
ERROR AS GROUNDS FOR RESCISSION
One of the requisites to the validity of a contract is the consent of the parties. LSA-C.C. Article 1797. Consent is vitiated by error of fact, LSA-C.C. Articles 1819 and 1820, where the error is in some point which is a principal cause for making the contract, LSA-C.C. Article 1823. A principal cause is defined as one without which the contract would not have been made, LSA-C.C. Article 1825.
These statutory rules have been applied in many cases in our jurisprudence. In Cheramie v. Stiles, 215 La. 682, 41 So.2d 502 (1949) the plaintiff employed the defendant attorney to secure cancellation of a mineral lease. As a part of the fee, plaintiff conveyed to the attorney an interest in the minerals. Later it was discovered that the rentals on the lease had actually been paid to a bank for plaintiff's account, thereby rendering annulment of the lease impossible. Plaintiff sued the attorney to rescind for error the conveyance of mineral interest to him. The court canceled the contract, holding as follows:
"(4) The existence of an error of fact proceeding from ignorance of what really exists or the mistaken belief in the existence of facts which are the principal cause of and bear upon the motive for the yielding of consent to an agreement are sufficient grounds to set aside a contract. Calhoun v. Teal, 106 La. 47, 30 So. 288.
"Consent is vitiated by error. Pan American Production Co. v. Robichaux, et al., 200 La. 666, 8 So.2d 635."
Mutual error of fact is not necessary to abrogate a contract. Unilateral error is sufficient. Peoples Homestead & Savings Association v. Worley, 191 La. 453, 185 So. 880 (1939); Louisiana Sulphur Mining Company v. Brimstone Railroad & Canal Company, 143 La. 743, 79 So. 324 (1918); Berard's Heirs v. Berard, 2 La. 1 (1830); and Pan American Petroleum Corporation v. Kessler, 223 F.Supp. 883 (D.C.1963) a federal case from Louisiana which, like the present matter, deals with the release of a mineral lease through error of fact.
Under these authorities, it is clear that the release dated September 26, 1966 was executed through error of fact which vitiates the consent of Humble and renders the instrument unenforceable. There can be no question that Humble did not intend to release those portions of the Chappuis tract which remained in the two producing units. It is incredible that Humble's employees intended to voluntarily give up such valuable assets for no consideration whatever. Mr. Morrow did not even request such a release. Mr. Spence, who made the original error by placing the red "R" on the Special Drill Sheet, did not intend to release the producing acreage, nor did Miss Wells or Mr. Saint. Mr. Matthews signed the release thinking that all of the leases had expired. He would not have signed had he known the release covered producing lease interests valued at $1,792,527.
With regard to Humble's alternative demand that the release be reformed, we, like the trial judge, find that this relief must be denied since the error was not mutual. Humble contends that since Mr. Cliff Morrow was the broker who negotiated the lease, he represented the Chappuis group when he requested the release. Morrow testified he intended the release to cover only the acreage in the nonproducing unit. On this basis Humble says the error was mutual.
*405 We find no evidence of any mandate from the Chappuis family to Mr. Cliff Morrow to request the release. Hence, no error is attributable to them. It is fundamental in our law that mutual error is required to reform a contract to make it conform with the true intention of the parties. Louisiana Sulphur Mining Company v. Brimstone Railroad & Canal Company, supra; Carter Oil Company v. King, La.App., 134 So.2d 89 (2d Cir. 1961).
Having reached the conclusion that the release must be rescinded for error of fact, it is unnecessary for us to consider Humble's additional contention that Mr. Matthews' power of attorney authorized him to release only expired leases and not those which had not expired.
REVIEW OF DEFENDANTS' ARGUMENTS
Defendants' principal contention is that the failure of Mr. Matthews and Mr. Saint to read and carefully recheck the release is such negligence as to preclude rescission of the instrument by Humble. Defendants rely on cases which hold that a party must read an instrument before he signs it, else he cannot later seek to avoid its effect for error. See Fontenot v. Coreil, La.App., 2 So.2d 97; Carter Oil Company v. King, La.App., 134 So.2d 89; Southwest Gas Producing Company v. Hattie Brothers, 230 La. 339, 88 So.2d 649 and Price v. Taylor, La.App., 139 So.2d 230.
We find these cases are distinguishable. Even if Mr. Matthews, the person who signed, had read the release in full, he would not have discovered the error. The instrument purported to release only leases which had expired. It made no mention of releasing producing acreage. It is true Matthews could have called for the maps and the leases and could, by careful study, have discovered the error. However, Mr. Matthews relied on the initials by Mr. Saint who in turn had relied on the red "R" by Mr. Spence. It was not a failure by Matthews to read the instrument which caused the error.
Defendants also contend there was no error of fact by Humble. The basis of this argument is the testimony of Mr. Spence that he knew the red "R" signified expiration of a lease and that he intentionally placed this symbol on the Special Drill Sheets. However, from a reading of the testimony of Mr. Spence as a whole, it is clear that although he intentionally placed the red "R" on the sheet, he thought the other employees would understand this symbol was limited by the special notation on the bottom of the sheet that the entire acreage had not expired. Spence was simply in error in this assumption. Nevertheless, it is clear that Spence had no intention whatever to release the entire acreage on behalf of Humble.
Defendants also contend that both Humble and the Chappius family intended to release the entire lease. This argument has no merit since we have already concluded that Humble did not so intend.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendants appellants.
Affirmed.
FRUGÉ, Judge (dissenting).
I am unable to agree with the majority's opinion and I respectfully dissent therefrom.
The system employed by Humble Oil & Refining Company to determine which releases were to be terminated vested almost complete authority in Mr. James Spence, Supervisor in charge of Producing and operating Acreage Units in the Acadia Parish area. When he determined that a lease should be terminated in its entirety, he would so indicate by marking the drill sheets on such acreage with a red "R". Once this symbol was placed on the pertinent documents, the decision to *406 terminate the lease was, for all practical purposes, final since there was no effective review of this decision under the system employed by Humble Oil & Refining Company.
The record reflects that Mr. Spence was very familiar with the facts concerning the Chappuis lease, and he knew some units under the lease were still producing. His indicating that the lease should be cancelled in its entirety amounted to gross negligence, in view of his special knowledge concerning the Chappuis lease.
This negligence, attributable to Humble Oil & Refining Company, should prevent the plaintiff from securing reformation or rescission of the lease agreement entered into between the parties. Pike v. Kentwood Bank, 146 La. 704, 83 So. 904; Silbernagel et al. v. Harrell et al., 18 La.App. 536, 138 So. 713.
Also, it is clear that there was no error on the part of the defendants in executing the release agreement. Therefore, if there was error it was not mutual and the contract cannot be reformed or rescinded. Reynaud v. Bullock et al., 195 La. 86, 196 So. 29 (1940); Hello World Broadcasting Corp. v. International Broadcasting Corp., 186 La. 589, 173 So. 115.
For the foregoing reasons, I respectfully dissent.

ON APPLICATION FOR REHEARING
En Banc. Rehearing denied.
FRUGÉ, J., votes for Rehearing.
MILLER, J., votes for rehearing and assigns written reason.
MILLER, Judge.
Humble Oil & Refining Company released a producing lease, which they now claim was released through error.
It was established that Humble's employee was negligent in signing the release in question. Mr. Claude Matthews testified that he did not read the release instrument which he executed. Everyone who had any connection with this release instrument, including Mr. Percy Sainte, testified that they did not check what they prepared and allowed to be executed. Both Matthews and Sainte testified that they could have easily ascertained that they were releasing a producing lease.
A party cannot rescind an instrument which he negligently executed. Standard Oil Company of Louisiana v. Futral, 204 La. 215, 15 So.2d 65 (1943); Fontenot v. Coreil, 2 So.2d 97 (La.App.Orls.1941); Willis v. Gordon, 94 So.2d 99 (La.App. 1 Cir. 1957); Price v. Taylor, 139 So.2d 230 (La.App. 1 Cir. 1962).
I would grant defendants' application for rehearing.