**Albert J. OTTO and Southern Marketing, Inc.**

v.

**CITIES SERVICE COMPANY.**

**Civ. A. No. 76–0416.**

United States District Court, W. D. Louisiana, Shreveport Division.

July 1, 1976.

---

T. K. Giddens, Jr., John L. Schober, Jr., Feist, Schober & Howell, Shreveport, La., for plaintiffs.

Marlin Risinger, Jr., Blanchard, Walker, O'Quin & Roberts, Shreveport, La., for defendant.

## MEMORANDUM RULING

STAGG, District Judge.

This is an action for injunctive relief brought by Albert J. Otto and Southern Marketing, Inc. under the general equitable power of the federal courts and under the provisions of 15 U.S.C. § 26, in which plaintiffs seek preliminarily to enjoin defendant, Cities Service Oil Company, from terminating the provisions of a branded distributorship agreement and other related agreements. Plaintiffs allege that the termination of the agreements would constitute a violation of the federal antitrust laws. Additionally, plaintiffs assert that the written distributorship agreement does not accurately reflect the agreement between the parties, that the written agreement should be reformed to reflect the true intention of the parties, and that defendant is estopped from cancelling the agreements.

1. Plaintiffs' Exhibit 2.

## FINDINGS OF FACT

In March of 1972, Mr. Otto was, and had been for a considerable period, a successful consignee for a major oil company in Shreveport. During that month he was approached by a representative of defendant who proposed that Mr. Otto leave his position in order to assume the position of Cities Service distributor for the Shreveport area, a position which had become vacant by the retirement of the existing distributor. During preliminary negotiations with Mr. Richard Heinzelmann, District Sales Manager for Cities Service; Mr. Potter, Cities Service's District Manager; and Mr. J. L. Burnett, who replaced Mr. Potter as District Manager, plaintiff Otto maintained the position that he would only be interested in the distributorship if he could be assured of a long-term relationship with defendant. He was told that although the branded distributorship agreement would be for a stipulated term with annual renewals, he could reasonably expect repeated renewals unless Cities Service became dissatisfied with his performance.

Pursuant to these assurances, Otto arranged to borrow the substantial sums of money which would be required to begin operations as a distributor. Mr. Heinzelmann aided in securing the necessary financing by meeting with Otto's banker and preparing a *pro forma* earnings statement and sales revenue projection [1] which outlined the arrangements and proposed relationships between Otto and his corporation, Southern Marketing, Inc., and Cities Service.

On May 30, 1972, plaintiff Southern Marketing, Inc., through its president Albert Otto, and Cities Service, executed the written branded distributor agreement [2] whereby Cities Service agreed to sell its petroleum products to Southern and Southern agreed to purchase such products for resale, as distributor, to consumers, retailers and dealers under Cities Service's brands. Shortly thereafter, Cities Service and Southern entered into a credit card agree-

2. Plaintiffs' Exhibit 3.

ment,[3] a tires-batteries-accessories distributorship agreement,[4] a painting agreement,[5] a sign rental agreement,[6] a service station imprinter lease,[7] an equipment lease [8] and a real estate lease,[9] all of which were accessory to the distributorship agreement.

The distributorship agreement provided, in part:

"2. DURATION: This agreement shall be effective for the term of *three (3)* years, beginning *July 1, 1972* and shall be deemed to be renewed for successive annual periods unless either party shall give to the other, not less than one hundred and twenty (120) days prior to the date of expiration of the original or any renewal term, written notice of election not to renew."

The closing paragraph of the agreement stated:

"All understandings and agreements relating to the subject matter hereof, either verbal or written, except insofar as incorporated in this agreement, are hereby cancelled and withdrawn. This instrument constitutes the entire agreement of the parties in respect of the subject matter hereof and may be altered only by a writing signed by the parties hereto. This agreement shall not be binding upon CITGO until it has been duly accepted by CITGO as evidenced by the signature of its Vice President or Region or Area Manager endorsed hereon. Commencement of dealing between the parties shall not be deemed a waiver of this requirement."

When confronted with the three-year contract term, Otto again expressed his desire for a long-term relationship and was told that such a relationship could reasonably be expected if the arrangement worked out satisfactorily, although the contract gave either party the right to terminate at an anniversary date of the term. Under the agreement, Southern took over the sales and distribution formerly made by Cities Service's Shreveport consignee but Cities Service retained its direct sales to the service stations it owned or held under lease and which were operated by contract dealers.

During the initial term of the contract, plaintiffs' performance was exemplary. Southern developed and procured additional retail outlets which were owned or leased by individuals who purchased defendant's products from plaintiffs. Additionally, Southern developed a wholesale business which greatly exceeded Cities Service's previous sales performance in this area. Defendant's satisfaction with plaintiffs' performance was reflected in several letters of commendation sent to plaintiffs' by representatives of defendant.[10]

Despite plaintiffs' successful operation, due to drastic changes in the oil industry caused by the energy crisis, Cities Service decided to alter its marketing program. The alteration consisted of the construction, in Shreveport, of several Quick-Mart stations, high volume-low cost retail petroleum outlets, to which Cities Service would sell directly. With these direct sales, defendant decided that it would no longer need a Shreveport distributor. Thus, on February 23, 1975 Cities Service requested Southern to agree to a mutual termination of the distributorship contract to be effective as of June 30, 1975, the end of the initial three-year term. At the same time defendant offered Southern a new distributorship contract for a one-year term running through June 30, 1976 with a provision for annual renewals. This conversion to a one-year contract was in accordance with Cities Service's conversion to a direct marketing program. Southern executed the mutual

---

**3.** Plaintiffs' Exhibit 5.

**4.** Plaintiffs' Exhibit 4.

**5.** Plaintiffs' Exhibit 11.

**6.** Plaintiffs' Exhibits 8 and 9.

**7.** Plaintiffs' Exhibit 7.

**8.** Plaintiffs' Exhibit 10.

**9.** Plaintiffs' Exhibit 6.

**10.** Plaintiffs' Exhibits 14 and 15.

cancellation and the new one-year contract on February 23, 1975.[11]

On February 28, 1975 Cities Service orally notified Southern that it would not renew the distributorship contract beyond June 30, 1976. Due to a delay in the marketing changeover, on February 23, 1976 Cities Service proposed to Southern that it would extend the distributorship for one additional year to June 30, 1977, if Southern would agree to a rental payment of $500 per month on the real estate lease of the bulk plant for which Southern had been paying $250 per month under the old agreements. Southern declined the proposal and Cities Service immediately gave Southern notice of nonrenewal of the one-year contract expiring June 30, 1976. On April 21, 1976 plaintiffs instituted this action wherein they seek to enjoin the termination of the distributorship agreement for the reasons previously stated.

A hearing on plaintiffs' application for a preliminary injunction was held on May 17 and 18, 1976. At the conclusion of the hearing, the Court stated that plaintiffs had failed to demonstrate a reasonable probability of success on the merits[12] of their antitrust claim and ordered the parties fully to brief the Louisiana law relating to the contract claims and the claim of estoppel.

## CONCLUSIONS OF LAW

### A. *ANTITRUST VIOLATIONS*

In a case substantially similar to the case at bar, Judge Stevens, now Justice Stevens, found no antitrust violations to have been shown. *Mullis v. Arco Petroleum Corporation,* 502 F.2d 290 (7th Cir. 1974). The *Mullis* opinion strengthens this Court's initial decision that plaintiffs had failed to demonstrate a probable success on the merits of their antitrust claim. See also *Bougeois v. A. B. Dick Company,* 386 F.Supp. 1094 (W.D.La.1974).

### B. *CONTRACT CLAIMS*

Plaintiffs contend that the three-year term with annual renewals, or the one-year term with annual renewals, does not accurately reflect the agreement between the parties. Instead, plaintiffs assert that the agreement was to continue in effect indefinitely until just cause existed for termination of the relationship and that the written distributorship agreement was merely a matter of form. Alternatively, plaintiffs claim that the representations made by Mr. Heinzelmann, to the effect that plaintiffs could anticipate a long-term relationship, constituted a collateral oral agreement which would prohibit the threatened termination by Cities Service without cause.

The testimony adduced at the hearing showed Mr. Otto to be experienced in petroleum product marketing. As a sales representative and later a division sales manager, Otto had handled and supervised the renewing of distributorship contracts for Continental Oil Company. He was aware from this experience that such contracts provided a stated term and expired at the end of that term unless renewed.

Based on his knowledge of the industry, Otto knew, or should have known, that Heinzelmann did not have the authority to bind Cities Service and that any contract would have to be approved by a representative of defendant above Mr. Heinzelmann. From this, the Court concludes that there was no collateral agreement between plaintiffs and defendant. Furthermore, the parol evidence rule set forth in LSA–C.C. article 2276 which provides that written contractual terms may not be contradicted by evidence of any prior oral agreement, prohibits evidence of Mr. Heinzelmann's, Mr. Potter's or Mr. Burnett's representations concerning the term of the contract from altering the terms of the subsequent written distributorship agreement, even if

---

11. The evidence shows that had plaintiffs refused to execute the cancellation and the new one-year agreement defendant would have given notice of nonrenewal of the three-year contract.

12. *Blackshear Residents Organization v. Romney,* 472 F.2d 1197 (5th Cir. 1973); *Buchanan v. U. S. Postal Service,* 508 F.2d 259 (5th Cir. 1975).

these representatives had the authority to bind the defendant. 35 La.L.Rev. 779 (1975). *Alesce v. Hutton-Donaldson, Inc.,* 324 So.2d 506 (La.App.2d Cir. 1975), rehearing denied en banc. January 6, 1976; *Baton Rouge Sash & Door Company, Inc. v. Saale,* 298 So.2d 115 (La.App.1st Cir. 1974), rehearing denied August 13, 1974.

■ Apparently anticipating the applicability of the parol evidence rule to the prior oral representations, plaintiffs contend that since the written agreement was contrary to the prior oral representations, there was a mistake in reducing the agreement to writing which would allow this Court to reform the agreement in accordance with the intent of the parties. *Ober v. Williams,* 213 La. 568, 35 So.2d 219 (1948); *Agurs v. Holt,* 232 La. 1026, 95 So.2d 644 (1957); *B. Segall Company, Inc. v. Trahan,* 290 So.2d 854 (La.1974). Parol evidence is admissible to establish the mutual error and mistake. *Trahan, supra.* However, to establish such a mistake or error there must be clear and the strongest possible proof of the true terms of the agreement, with the burden resting on the person desiring the reformation to establish the mutual error. *Reynaud v. Bullock,* 195 La. 86, 196 So. 29 (1940); *Weber v. H. G. Hill Stores Co.,* 210 La. 977, 29 So.2d 33 (1946); *Trahan, supra.*

The only evidence plaintiffs offer to support reformation for mutual mistake or error is the testimony that Mr. Heinzelmann understood that Otto wanted to enter into a long-term arrangement. Both Mr. Potter and Mr. Burnett made it clear to Otto that the contract would be for a three-year term and that although Otto could reasonably expect renewal, either party would have the right to terminate at the end of a term by electing not to renew. There is no evidence whatsoever to show that Cities Service did not intend for the contract to provide for mutual nonrenewal rights depending solely on the will of the parties. Mr. Burnett testified that the stated term in such contracts, and the availability of termination by nonrenewal, is essential as a means whereby Cities Service can revise its marketing programs to accommodate changes in marketing conditions. This Court finds that plaintiffs have failed to demonstrate their probable success on the merits on a claim of either a collateral agreement or mutual mistake or error and that the nonrenewal clause contained in the written distributorship agreement was intended to be the complete manifestation of the agreement insofar as the contract term is concerned.

■ Initially, both in brief and in the complaint, plaintiffs alluded to fraud on the part of defendant in the contract negotiations. However, in a subsequent brief plaintiffs stated:

" * * * This case really seems to fall more within the realm of error and misrepresentation than legal fraud." Supplemental Memorandum, June 11, 1976, p. 5.

Based upon this statement the Court concludes that plaintiffs have waived a claim of fraud and thus it is unnecessary for this Court to consider such a claim. In passing, however, the Court notes that the only fraud which would give rise to an action for reformation would be such fraud as manifests itself in a written agreement which expresses a different purpose from that which the parties had agreed on and intended to embody therein. *Weber, supra.* Such fraud is in the nature of a mutual error or mistake which has been discussed previously. Any other finding of fraud would vitiate the agreement, LSA–C.C. articles 1779, 1819 and 1847, a result which plaintiffs apparently are seeking to avoid.

Plaintiffs' final contractual argument is that the agreement was an adhesion contract, or alternatively, a contract containing a potestative condition. Apparently, plaintiffs are arguing that that part of the contract dealing with the term should be declared null and rewritten, without affecting the remainder of the contract. In Volume 6 of the Louisiana Civil Law Treatise, Professor Litvinoff states at pages 346 and 347:

"Not always are contracts formed through a process of negotiation and bargaining. Necessities of modern life have gradually developed a kind of contract

one of the parties to which is not free to bargain. This takes place when a concern or enterprise carries out its operation through a very large number of contracts entered into with any number of co-contractants, such as public utility companies, railroads, or insurance companies. In fact, the consumer is in no bargaining position at all when applying for power for his home or buying a railroad ticket. The offer of those furnishing the services adopts the form of a take it or leave it proposition, and the acceptance, therefore, is nothing but total submission to all the conditions stipulated by the other party.

"In situations of this sort there is a manifest imbalance between the parties, as one of them wields unquestionably more power than the other. The less powerful party is left with no choice other than to adhere to the proposed terms—'contracts of adhesion'—a formula coined by a prominent French writer."

Professor Litvinoff concludes on page 351 by stating that Articles 1766 and 1811 of the Louisiana Civil Code govern adhesion contracts in Louisiana.

█ The written distributorship agreement clearly is not an adhesion contract. The requisite imbalance of bargaining positions is lacking. Although it is clear that Cities Service occupies the superior bargaining position, the degree of the superiority over plaintiffs is not such as would give rise to a contract of adhesion. Otto was free to bargain as to any terms of the contract and if he was dissatisfied with Cities Service's response, he could refuse to become its distributor, choosing instead to remain in his admittedly successful occupation.

█ Also, it is clear that the mutual at-will nonrenewal clause is not a potestative condition, nor is it a clause which violates the public policy of Louisiana. Courts have frequently been asked to review such provisions and no reported case, of which this Court is aware, has held that a clause giving either party the right, without cause, to refuse to renew an agreement is *contra bonos mores.* In addition, the Louisiana Supreme Court has ruled that such a clause, even if it is a potestative condition, does not constitute a purely potestative condition which would affect the validity of the contract. *Long v. Foster & Associates, Inc.,* 242 La. 295, 136 So.2d 48 (1961), rehearing denied January 15, 1962. See also 47 Tul.L. Rev. 284 (1973) and 22 La.L.Rev. 872 (1962).

Plaintiffs further argue that the written distributorship agreement, insofar as the term of that agreement is concerned, should be construed according to industry custom. Plaintiffs urge this Court to find the existence of an industry custom to renew distributorship contracts unless good cause exists for nonrenewal. The sole proof offered to substantiate a claim of industry custom was the testimony of Mr. Otto and of Mr. Jere Overdyke, a jobber for defendant, to the effect that distributorship or consignee agreements usually continue over a long period of time. Defendant admits that this has been the normal trend in the past, but that changed market conditions necessitated an alteration in this trend.

█ This Court is not convinced that the past pattern of automatic renewals absent good cause for nonrenewal has risen to the level of an industry custom. Even if so convinced, however, custom may supply incidents to a contract only if that contract is silent on the point to which the custom relates. LSA–C.C. articles 1903 and 1964. In the case *sub judice* a custom of automatic renewals could be applied only if the written distributorship agreement was silent as to renewals or was ambiguous on the point. The contract in question is neither silent nor ambiguous on the issue of its term. Instead, it is very explicit in its wording that either party can, by giving the specified notice, elect not to renew the contract. Evidence of a contrary industry custom cannot modify this clear contractual term.

### C. ESTOPPEL

Paragraph 25 of plaintiff's complaint alleges that defendant should be estopped

from terminating the branded distributorship agreement. As the basis for their estoppel argument, plaintiffs assert that they have relied to their detriment on the expectation of an extended relationship by incurring long-term financial obligations.

The Court notes in passing that under Mandatory Petroleum Allocation Regulations of the Federal Energy Administration, Cities Service is required to continue to sell and deliver to Southern a certain volume of petroleum products without regard to termination of the distributorship agreement. Thus plaintiffs are protected in their source of supply and the only immediate effect of termination of the distributorship agreement will be the loss of the Cities Service name (Citgo), credit card service and the bulk plant. The damage caused by the loss of the Citgo name is mitigated by the fact that plaintiffs are already successfully marketing premium grade gasoline under their own trade name.

There are apparently three types of estoppel recognized under Louisiana law, namely: (1) Estoppel by deed; (2) Estoppel by record; and (3) Estoppel *in pais*, or equitable estoppel. *Humble Oil & Refining Company v. Boudoin*, 154 So.2d 239 (La.App.3rd Cir. 1963), writ refused, 245 La. 54, 156 So.2d 601 (1963); *Babin v. Montegut Insurance Agency, Inc.*, 271 So.2d 642 (La.App.1st Cir. 1972), rehearing denied January 31, 1973. Plaintiffs herein apparently are pleading equitable estoppel as clearly estoppel by record or deed would be inapplicable.

"Equitable estoppel, or 'estoppel in pais', can be defined as the effect of the voluntary conduct of a party whereby he is barred from asserting rights against another party justifiably relying on such conduct and who has changed his position to his detriment as a result of such reliance. Thus, there are three elements of estoppel: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." (Citations omit-

ted.) *Wilkinson v. Wilkinson*, 323 So.2d 120, 126 (La.1975).

The burden is upon plaintiffs clearly to prove all of the essential elements of their plea of estoppel as estoppels are not favored under the law of this state. *Wilkinson, supra.*

To succeed on a claim of equitable estoppel, plaintiffs would have to prove that defendant represented to them that the distributorship agreement would not be cancelled except for cause. This Court has already found that defendant made no such representation and that plaintiffs were aware that the contract would be for a three-year term and, although renewals could be expected, either party retained the right to terminate the agreement without cause at the expiration of the term. There is no reasonable probability that plaintiffs will succeed in proving a claim of equitable estoppel.

In conclusion, plaintiffs have failed to demonstrate a reasonable probability of eventual success on the merits. As the Court stated in *Davis v. Crown Central Petroleum Corporation*, 483 F.2d 1014 (4th Cir. 1973):

"The claim of the plaintiffs is appealing and our sympathies are with them."

However, in this Court's opinion, the law is not with the plaintiffs thus the Motion for a Preliminary Injunction is denied. This Memorandum Ruling shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.