**INTERPACE CORPORATION**

v.

**The BOARD OF COMMISSIONERS OF the PORT OF NEW ORLEANS.**

Civ. A. No. 79–3021.

United States District Court,
E. D. Louisiana.

April 30, 1980.

---

Eugene R. Preus of Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for plaintiff.

Wiley G. Lastrapes of Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendant.

CHARLES SCHWARTZ, Jr., District Judge.

This matter came on for non-jury trial on a former day. At the conclusion of trial the case was submitted for further review by the Court. Now, having carefully considered the evidence adduced at trial, the memoranda and oral argument of counsel, and the applicable law, and for the reasons hereinafter set out, it is the opinion of the Court that judgment should issue in favor of defendant and against plaintiff dismissing plaintiff's claim at its cost and prejudice.

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

Plaintiff, Interpace Corporation (hereinafter Interpace), is a Delaware corporation qualified to do and doing business in Louisiana, with its principal place of business in the state of New Jersey. Defendant, Board of Commissioners of the Port of New Orleans (hereinafter Dock Board), is a separately constituted agency of the state of Louisiana created by and operated pursuant to LRS 34:1 et seq.

On November 12, 1959 an agreement was entered into between the Dock Board and Bestwall Gypsum Company (Bestwall) which provided that, in consideration of the Dock Board's construction of a bulk handling terminal adjacent to certain Bestwall property in the city of New Orleans, Bestwall would loan the Dock Board $800,000 to be used to help defray construction costs. The agreement provided that the loan would be repaid over a twenty-five year period in annual installments of principal and interest totaling $62,000. Such installments were to be paid at the end of the year (ending November 19), out of and from dockage, wharfage, and other handling charges incurred by Bestwall for use of the terminal facilities. The agreement further provided that in the event Bestwall's use of the terminal facilities during any year generated charges less than $62,000, Bestwall would accept whatever amount was generated in full satisfaction and discharge of the Dock Board's obligation for such year's installment and the Dock Board would be credited as if it had made payment in the full amount of $62,000.

In 1966 the rights and liabilities of Bestwall under the November 12, 1959 agreement were assigned to Georgia Pacific Corporation. In 1969 Carey Salt Company acquired a portion of land and facilities adjacent to the bulk handling terminal from Georgia Pacific. On November 12, 1969, Carey Salt Company, Georgia Pacific, and the Dock Board entered into an agreement by which the rights and liabilities under the November 12, 1959 agreement were transferred to Carey Salt Company and the November 12, 1959 agreement was cancelled except as to those provisions brought forward and included in the November 12, 1969 agreement. Subsequently, Carey Salt Company was dissolved and its assets were acquired by Interpace Corporation.

Under Paragraph V of the 1969 agreement the principal balance on the original loan would be repaid in the following manner:

(1) Out of and from dockage charges assessed by Board against vessels owned or chartered by Carey or by Carey's parent corporation, Interpace Corporation, or other subsidiaries of said Interpace Corporation, and which vessels are assigned berths at the said Public Bulk Terminal, for the purpose of receiving, delivering, loading or unloading bulk cargoes, including particularly salt, for the account of Carey, or of said Interpace Corporation or other subsidiaries thereof, and

(2) Out of and from the wharfage, handling or other charges assessed by Board for the use of the facilities and services of said Public Bulk Terminal by Carey, or by Carey's parent corporation, Interpace Corporation, or by other subsidiaries of Interpace Corporation . . .

The 1969 agreement, like the 1959 agreement, also provided that if charges were not generated in any one year, there would be no payment and the Dock Board would be forever relieved from paying the yearly installment.

From 1970 through 1973, inclusive, Interpace incurred dockage, wharfage, and other charges for use of the bulk handling terminal and related berthing facilities that were repaid by the Dock Board at or near the end of each respective year. From 1974–1977, inclusive, Interpace did not incur any dockage, wharfage, and other charges for use of the facility, and no repayment was made by the Dock Board in those years.

Late in 1977, Interpace entered into negotiations with International Minerals and Chemical Corporation (IMC) for the lease or sale of the Interpace property adjacent to the public bulk terminal. The Dock Board

was aware that IMC was involved in negotiations with Interpace for the lease/sale of the Interpace property and that part of the negotiation included a possible assignment to IMC of Interpace's rights under the 1969 lease agreement.

Pursuant to those negotiations, in late February, 1978 an agreement back dated to January 1, 1978 was entered into between IMC and Interpace whereby an option was granted by Interpace to IMC to either lease or purchase all or a portion of the Interpace property (Exhibit 31). Under the terms of the option agreement Interpace and IMC agreed to share in any repayments generated by IMC's use of the bulk handling terminal and related facilities. The agreement provided that if the option to lease and/or purchase was exercised, then Interpace would assign its rights under the November 12, 1969 agreement to IMC. The agreement also provided that if the option was exercised IMC would make its best efforts to use the terminal and related facilities and would divide any repayments thus generated on the basis of 25% to IMC and 75% to Interpace.

Under date of January 5, 1978, Donald H. Weinblatt of IMC wrote to Mr. Edward S. Reed, Port Director for the port of New Orleans (Exhibit 32) advising of his company's consideration of construction of a petroleum coke calciner on the Interpace property, a project which he indicated would involve large expenditures in the New Orleans area, a large volume of shipping through the bulk terminal, and 15 year contracts with the port authorities and the bulk terminal lessees. Mr. Weinblatt advised of his understanding of the repayment agreement between the Dock Board and Interpace and of the fact that Interpace had indicated a desire to transfer the obligation to IMC in connection with IMC's use of the property. Mr. Weinblatt noted that the project would not be completed for some 2 years during which time IMC would not be shipping significant tonnage through the bulk terminal. He indicated that IMC and Interpace, " . . . are requesting the Board of Commissioners to rearrange the payment schedule to utilize the full present value of the repayment obligation, commencing with the operation of the facility." The contents of the letter were the subject of a Dock Board inter-office memorandum of January 19, 1978 (Exhibit 33) from Comptroller William H. Urban to Mr. Reed and others which reveals that Urban recommended that the Dock Board merely agree to an assignment of the indebtedness to IMC and withhold any agreement relative to rearrangement of the payment schedule. According to the testimony of Mr. Weinblatt, he was verbally advised by someone from the Dock Board in January, 1978 that there was "no way" there would be a moratorium on payments during the construction of the calciner facility.

In late January, 1978 Mr. Weinblatt became aware that IMC would, for approximately the next one and one-half years, be making increased usage of the port of New Orleans bulk terminal facility due to the fact that the Houston terminal ship loader would be out of operation during that period. Weinblatt told Mr. Barton Bayley, an attorney and director of Legal Support Services of Interpace, with whom he had been negotiating, of the increased usage anticipated and suggested that it might be used to take advantage of the Interpace repayment agreement with the Dock Board.

On March 14, 1978, a meeting took place at the request of Mr. Bayley at the office of Cyrus Guidry, chief counsel for the Dock Board. Present were Mr. Guidry, Dock Board attorney Joe Hamner, Dock Board comptroller Mr. Urban, Mr. Bayley of Interpace, and Mr. Weinblatt of IMC. The principal purpose of the meeting was to discuss the proposed present use of the terminal facility by IMC. The Dock Board personnel were aware at the time that IMC had entered into an option for the lease/purchase of the Interpace property, but that IMC was not yet definitely committed to exercising the option and building the proposed coke calciner plant.

The events which transpired at this meeting are the central issue of this case. According to Messrs. Weinblatt and Bayley,

the Dock Board personnel, led by Mr. Guidry as spokesman, advised that the Dock Board recognized the debt to Interpace, and indicated that it would be acceptable, without the necessity of further Dock Board approval, to allow the proposed use of the terminal by IMC to qualify Interpace for repayment under the November 12, 1969 agreement. Specifically they testified that Guidry advised that such credit to Interpace would not be contingent on the actual transfer of title of the goods shipped to Interpace from IMC or upon the chartering to Interpace of the vessels involved. Guidry, Hamner, and Urban take the position that they did not, nor did they have the authority to, make any binding agreement at the meeting. They further state that such use by IMC would not be acceptable absent a charter or transfer of title to Interpace.

Following the meeting, under date of March 20, 1978, Mr. Bayley wrote to Mr. Guidry requesting his "agreement and acknowledgement" that IMC shipments through the port be credited to Interpace without the necessity of changing title thereto. (Exhibit 36). On March 22, 1978, Mr. Guidry, by memo to Mr. Urban, requested that he review a copy of the March 20 letter from Bayley and noted, "The suggestions seem to be in accord with our discussion on March 14. Do you see any problems?" (Exhibit 38). Mr. Urban replied to that memo by memo of March 28, 1978 (Exhibit 39) stating that in his opinion the vessels handled would have to be chartered by Interpace and that it would be desirable to make the arrangement contingent upon the actual sale or lease to IMC.

According to Mr. Weinblatt's contemporaneous handwritten notes (page 51 of Exhibit 54), the Dock Board personnel at the meeting appeared, "ready to accept Interpace as an agent of IMC without transfer of title of material or Interpace handling charter." In a March 20 memo to Mr. R. A. Gant of IMC, Mr. Weinblatt noted that Mr. Guidry had suggested that "the board might consider Interpace IMC's agent for all material passing through the terminal. This is based upon the expectation that

IMC will build a calciner in the near future. However, the "agency" agreement would not be contingent on the calciner in any way." (Exhibit 37).

The Court finds as a matter of fact that no firm or binding agreement as to the use by IMC being credited to Interpace was reached at the March 14, meeting. Obviously, the Dock Board was aware of and eager for IMC to go forward with its proposed plan to build the coke calciner facility as it would obviously generate business for and be beneficial to the bulk terminal operation. Clearly, the Dock Board personnel represented that they would do whatever they could facilitate the IMC/Interpace sale/lease. However, it is clear that whatever may have been suggested and discussed, an agreement was not reached at that time. Mr. Bayley's March 20 letter requests Guidry's agreement. Mr. Guidry's memo to Urban refers to the contents of Bayley's letter as "suggestions" in accord with "our discussion." Mr. Urban's memo with additional suggestions further reveals the non-final nature of the discussions. Mr. Weinblatt's memos note that the board personnel "appeared ready to accept" the agreement and that the board "might accept" IMC as agent. All these communications compel the conclusion that no firm agreement was reached at the meeting of March 14.

The option granted by Interpace to IMC was extended but expired and was cancelled as of June 30, 1978. (See exhibit 41.)

On August 30, 1978 Messrs. Bayley and Weinblatt met with port director Reed for the purpose of discussing the crediting IMC's usage of the bulk terminal facility to the obligation owed by the port to Interpace. On September 13, 1978, Bart Bayley of Interpace wrote a letter to Mr. Reed demanding payment as of November 19, 1978, the date as of which payments were to be made yearly under the 1969 agreement (Exhibit 45). On December 15, 1978 Mr. Bayley wrote to Mr. Urban of the Dock Board demanding that the $62,000 repayment for the year ending November 19, 1978 be made (Exhibit 51).

Internal Dock Board memoranda (Exhibits 46–50) reveal that following receipt of the September letter from Bayley the Dock Board personnel were still not sure whether or not to agree to credit IMC's shipments to Interpace apparently wanting to court a potential port customer but unsure of what could be legally done. The Dock Board did not reply to Mr. Bayley's letter of September 13, and December 15, 1978, until it refused payment in a letter dated January 30, 1979 from Joe Hamner of the Dock Board legal staff to Mr. Bayley (Exhibit 52).

IMC shipped products through the bulk handling terminal in both the years ending November 19, 1978 and 1979 and in so doing generated charges for use of the terminal and related berthing facilities that exceeded the amount of $62,000 in each of those years. During those years Interpace did not make use of the bulk handling facility so as to generate rebates under the 1969 agreement.

Considering the foregoing, we reach the factual conclusion that when IMC realized that it would be shipping through the port of New Orleans as the result of the ship loader accident in Houston, IMC, along with Interpace sought to take advantage of this fact to generate repayments to Interpace. This was beneficial to both, as Interpace was getting no repayment as the result of its lack of use and IMC would, pursuant to the agreement with Interpace, get 25% of the repayments generated by its cargo. It is clear, however, that whether or not the IMC shipments were able to generate repayments, the cargo was going to be shipped through New Orleans because the Houston facility was not operational. The Dock Board was most receptive to the suggestions made by IMC and Interpace as it was eager to court a potential customer which proposed to generate substantial business for the bulk handling terminal. The board personnel were willing to try to accommodate IMC/Interpace for this purpose and probably would have made every effort to make the IMC shipments qualify which they felt that they could legally do. However, when IMC was no longer a poten-

tial customer, the impetus was removed. Absent the possibility of gaining revenue for the facility, there was no reason for the board to agree to the IMC/Interpace proposal. As things were, the Dock Board was relieved of repayments due to the lack of use by Interpace.

While it is clear that the Dock Board's position relative to working out an arrangement to allow the shipments to qualify changed, this fact is not controlling on the outcome of this case as it is clear that no firm agreement was never reached and the discussions as to the possibilities were no more than that. After receiving no reply to his request for agreement to the proposal by letter of March 20, 1978, Mr. Bayley did not follow up. In fact it appears that neither IMC nor Interpace set about doing anything until the time for receiving payment approached. During the interim they did not request clarification of the board's position, the execution of any written agreement, or any other means of formal or informal agreement to the proposal.

## CONCLUSIONS OF LAW

Plaintiff takes the position that the agreement of November 12, 1969 was orally amended so as to allow the IMC shipments to qualify Interpace for repayments. In the alternative, it is urged that the Dock Board by its conduct is estopped from denying repayments to Interpace. As previously noted we reject both arguments.

■ With regard to the question of oral amendment, it is clear that there was no firm agreement reached with regard to crediting the IMC shipments to Interpace at the March 14, 1978 meeting. As there was never any agreement reached we hold that there was never any oral amendment to the November 12, 1969 agreement.

■ Equitable estoppel, while recognized by Louisiana law, is not favored and a plaintiff asserting it has the burden of proving all of the essential elements of such a claim by a preponderance of the evidence. *Wilkinson v. Wilkinson*, 323 So.2d 120 (La.,

146

1975); *Otto v. Cities Service Co.*, 415 F.Supp. 837 (W.D.La., 1976).

> "Equitable estoppel, or 'estoppel in pais,' can be defined as the effect of the voluntary conduct of a party whereby he is barred from asserting rights against another party justifiably relying on such conduct and who has changed his position to his detriment as the result of such reliance. Thus, there are three elements of estoppel: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance."
> (citations omitted). *Wilkinson v. Wilkinson supra*, at p. 126

Equitable estoppel arises when,

> " . . . · a person, by his acts, representations or admissions, or even by his silence when it is his duty to speak, intentionally or through culpable negligence, induces another to believe that certain facts exist and the other person rightfully relies and acts on such belief and will be prejudiced if the former is permitted to deny the existence or the truth of such facts." *Shirey v. Campbell*, 151 So.2d 557 (La.App., 2nd Cir. 1963).

Estoppel by silence arises only when a person is under a duty to another to speak. *Carver v. Liberty Mutual Insurance Company*, 277 F.2d 105 (5th Cir. 1960).

In the instant case we find that at the March meeting and thereafter neither Mr. Guidry nor anyone else from the Dock Board made any affirmative representation to anyone from IMC or Interpace that the shipment by IMC through the terminal without change of title or charter to Interpace would qualify Interpace for repayment by the Dock Board. These matters were discussed as possibilities but were never firmly agreed upon nor was the fact of eventual agreement ever a certainty.

Plaintiff urges that the silence of the Dock Board to the letter of Mr. Bayley of March 20, 1978 constitutes a basis for estoppel by silence. We think not. Mr. Bayley's letter requested an acknowledgement. When none was forthcoming the agreement of the Dock Board, rather than being suggested by the silence, was cast in doubt. Mr. Bayley, a lawyer and businessman, should have been put on notice that no agreement had been made as it was not firm at the end of the March 14 meeting and was not thereafter confirmed in any way by the Dock Board. The record is further devoid of any evidence that the Dock Board by its silence sought to mislead Interpace or IMC. It was Interpace and IMC who were seeking an accommodation from the Dock Board which inured to their benefits, it was they who had a duty to go forward with firming up the agreement. However, rather than doing so, Interpace did nothing further until the meeting with Mr. Reed of August, 1978, a point by which most of the year for which the repayment would be made had expired.

In summary we hold that no agreement relative to the IMC shipments was ever reached at the March 14, 1978 meeting. No representation that the shipments would, without charter or title change, qualify Interpace for repayment was made by the Dock Board thereafter. The Dock Board's silence in response to the letter of Mr. Bayley of March 20, 1978 was neither intentionally nor negligently misleading and the Dock Board was under no duty to clarify the situation for Interpace. Interpace was not justified under the circumstances in relying, if in fact it did, upon the Dock Board's silence to signify assent. The doctrine of equitable estoppel is not applicable to the instant case as the proof fails to support all the essential elements thereof.

In light of the foregoing, the Clerk is instructed to enter judgment in favor of defendant, Board of Commissioners of the Port of New Orleans, and against plaintiff, Interpace Corporation, dismissing plaintiff's claims herein at its cost and prejudice.