WILLIAMS, Judge.
Defendant appeals a trial court judgment ordering specific performance of a contract to sell an oyster boat and to assign leases of oyster beds to plaintiff. We amend and affirm.
On June 27 and 28, 1981, an advertisement placed by defendant, Van M. Robin, appeared in the New Orleans Times-Pieay-une, reading “[f]orty-five foot oyster lugger top shape, GM671, two to one, 368 acres of bedding ground, asking $25,000, 682-7156.” Plaintiff, Anthony J. Lulich, telephoned defendant about the advertisement, because his son was interested in getting into the oystering business. On either June 29 or June 30, 1981, plaintiff, his son, and defendant arranged to drive out to view the vessel. Both plaintiff and defendant testified that on that day plain *782 tiff agreed to purchase, and defendant to sell, the oyster lugger and 368 acres of oyster bedding for $25,000.00. Both plaintiff and defendant were in accord that the transaction was to include both the vessel and the leases.
Either that evening, or the following one, plaintiff telephoned defendant and told him he would like to put a down payment on the transaction. Without informing plaintiff, defendant telephoned defendant’s mother-in-law and asked her to draw up a receipt for the sale of the boat. Defendant’s mother-in-law, a housewife, had written up such forms for defendant in the past. Defendant admitted having contracted with plaintiff not only for the sale of the vessel, but also for the transfer of the oyster leases. When asked why he forgot to direct his mother-in-law to include the leases in the written agreement when they were part of the contract, he testified, “[i]t just passed my mind.” Plaintiff was first informed of the written agreement when he arrived at defendant’s house to deliver the down payment. Plaintiff read the handwritten document and signed it; he testified, however, that it was always understood that the sale was to include the vessel and the leases. Plaintiff delivered to defendant a check for $3,000.00 on which was noted “Deposit for Oyster Bed and Boat.” Defendant admitted that he accepted plaintiff’s deposit to bind the sale of the vessel and the leases. Defendant then deposited the check in his account. Also around July 1, 1981, defendant delivered to plaintiff a letter regarding the registration of the vessel and original lease papers for the involved leases. Defendant admitted that he gave these documents to plaintiff in furtherance of plaintiff’s acceptance of defendant’s offer to sell the oyster bed leases and oyster boat. Plaintiff testified that after the written agreement was signed, he and defendant agreed that they would not pass the Act of Sale until after the first of August because defendant was waiting for the completion of construction on a new vessel. Defendant further admitted that the only thing preventing him from physically transferring the vessel to plaintiff was the fact that he had another vessel under construction and was waiting for delivery of that vessel so that he could continue oyster farming.
Defendant admitted that he had received other calls about the advertised vessel and leases and that he had told these people he could not negotiate with them because he had already entered into an agreement with plaintiff.
In preparation for the contemplated Act of Sale, after the first of August, plaintiff had his attorney form a corporation for the purpose of harvesting oysters. Plaintiff then had his attorney draw up a bill of sale for the vessel and an assignment of leases for the oyster beds to transfer the boat and beds from defendant’s ownership to the newly-formed corporation’s.
Defendant took plaintiff’s son out to the oyster beds once in July and a second time in August. During the second trip, both plaintiff and defendant sighted an oil well near the involved bedding grounds. They then stopped off at the office of a “middleman” between oil companies and oyster fishermen, responsible for compensating leaseholders for damage done to their bedding grounds by the oil companies’ activities. There they viewed maps outlining the points at which oil pipelines would be passing through surrounding oyster beds.
Plaintiff and his son arranged for the vessel to be picked up the following day. They were unable, however, to contact defendant and arrange for a meeting at which the Act of Sale would be passed. Two or three days later, defendant telephoned plaintiff and informed him that he would not sell the oyster leases, although he would sell the oyster boat. Plaintiff insisted that he wanted to buy the boat and the leases as they had agreed upon. Plaintiff was then sent a letter from defendant’s attorney stating that “[d]ue to the illness of his wife, Mr. Robin cannot sell the boat, as it is needed by him to make a living and cover the unexpected medical expenses of her illness.” With the letter was a certified check in the amount of $3,000.00 repre *783 senting the return of plaintiff’s deposit. Plaintiff refused to cash the check as the letter stated that acceptance constituted full release.
In attempting to back out of the sale, defendant was relying upon a clause included by his mother-in-law in the agreement she wrote up reading, “[i]f for an emergency in either case and only a valid emergency' can either party cancel this written agreement. In either case both parties have an obligation to each other. The buyer must show proof of why he cannot complete the sale and return the deposit to the prospective buyer.”
Defendant never showed proof of an emergency before backing out of the sale, as required by the written contract, despite the fact that defendant’s wife’s heart ailment had begun appearing months before. In fact, defendant’s wife’s health condition was already a reality to defendant at the time he contracted with plaintiff. Defendant attempted to excuse this by testifying that he “was busy at the time,” and later, that he did not know plaintiff’s address or phone number, while admitting that he had never even consulted a telephone book for that information. Defendant said that it never occurred to him to return the July 1, 1981 deposit before his attorney sent the August 20, 1981 letter.
Defendant’s testimony was contradictory. He persisted in testifying that he had backed out of the sale, under the emergency clause, because he needed the boat to make a living and cover the unexpected expenses of his wife’s heart condition. After he had backed out of the sale, however, defendant continued to offer to sell plaintiff the boat, and refused to sell only the leases.
Defendant'later justified selling plaintiff only the boat with the fact that the written agreement only included the boat. Defendant admitted, however, that the written agreement did not embody the entire agreement which was for the boat and the leases. Defendant explained this discrepancy simply, testifying, “I changed my mind.”
After he spotted the nearby oil well on his second trip to the oyster bedding grounds with plaintiff’s son, defendant contacted Arkansas-Louisiana Gas Company. In February, 1982, Arkansas-Louisiana executed a damage release with defendant, paying him $12,000.00. Later in 1982, Arkansas-Louisiana allegedly paid defendant an additional $12,000.00. In the same year, three more oil companies contacted defendant, paying him a total of $5,400.00 in damages to the oyster beds due to oil exploration activities. All of these payments concerned the leases which defendant had .agreed to sell, along with the boat, to plaintiff.
Plaintiff brought suit demanding specific performance of the contract to sell the vessel and the leases, and alternatively, for the value of the property, $25,000.00, if actual delivery was not possible. Plaintiff also prayed for the value of expenses incurred by defendant’s failure to honor the agreement to sell.
The trial court rendered judgment in favor of plaintiff ordering defendant to execute an assignment to plaintiff of the four leases contracted for, and to pay plaintiff $20,400.00, representing the $15,000.00 proceeds of the sale of the vessel contracted for to a third party, and the $5,400.00 damage release money received from the three oil companies other than Arkansas-Louisiana.
Defendant appealed, alleging trial court error in: (1) failing to hold that defendant’s wife’s illness, and the delayed completion of defendant’s new boat, were emergencies allowing defendant to withdraw from the contract; (2) ordering specific performance of a contract to sell when earnest money had been given; (3) ordering specific performance of a contract of sale of an oyster lease without having such transfer in writing; (4) ordering specific performance of a contract to sell an immovable right without having a writing to evidence such right; and (5) ordering defendant to specifically perform his portion of the agreement without ordering the plaintiff to perform his portion of the agreement.
*784 EMERGENCY CLAUSE
The defendant in Admiral Paint Company v. Goltzman, 254 So.2d 104 (La.App.3d Cir.1971) also argued that ill health and delay causing production difficulties constituted an emergency excusing him from his obligation to perform. The court sympathized with defendant’s plight but explained, “[a]n added discovery of facts or circumstances that entail more difficulty in the performance of an obligation, difficulties which perhaps were not actually foreseen, will not release an obligor from his timely and proper performance. Louisiana Civil Code, Article 1891 “[citations omitted].” The court continued, “it is presumed that he has taken into account all possible malfunctions, difficulties, and potential obstacles, that could prevent timely performance.” Id. at 107.
Defendant was aware of his wife’s illness before entering into the agreement with plaintiff. Defendant had been monitoring the progress of his new boat before entering into the agreement, and he continued to do so afterward. The trial court felt that defendant’s misfortunes were an insufficient excuse for non-performance, and we must agree. Further, defendant did not comply with the provisions of his agreement, which required that he prove a valid emergency before backing out of the agreement.
EARNEST MONEY
To retain a greater liberty to recede from a promise to sell, each of the parties can agree that if he recedes from the agreement, he will abandon to the other a set sum, but will not be subject to a suit for specific performance. La.Civ.Code Art. 2463. Plaintiff and defendant both testified that a promise to sell the vessel and leases had been made the day before plaintiff left the deposit. The contract, already complete when plaintiff decided to put down a deposit the following day, cannot be considered to have been made with earnest. “After the contract to sell is entered into by the parties any amount of money paid by the purchaser can only be a partial performance on his part unless the parties agreed to modify the terms of the original contract.” Stipelcovich v. Mike Persia Chevrolet Co., 391 So.2d 582, 585 (La.App. 4th Cir.1980). The written agreement signed by the parties concurrently with the exchange of the deposit further negates any possibility that the deposit was earnest money, as it stressed that the promise was binding and could only be rescinded in a valid emergency. Rather, the deposit was partial performance of plaintiff’s obligation to pay under the contract.
EFFECT OF VERBAL AGREEMENT REGARDING OYSTER LEASES
Defendant argued previously in a motion for summary judgment, and again argues on appeal, that the promise to sell the oyster leases has no effect since it was not in writing as required by La.R.S. 56:423(E). That provision regulates the inheritance and transfer of oyster bed leases. It reads:
All leases in conformity with the provisions of this sub-part are heritable and transferable. They are subject to mortgage, pledge, or hypothecation and to seizure and sale for debt, as any other property right and credits in this State. This provision also applies to all buildings, betterments, and improvements thereon. No such inheritance or transfer is valid or of any force or effect whatsoever unless evidenced by an authentic act, judgment or proper judicial deed registered in the office of the department in a book provided for that purpose. (Emphasis added).
Defendant further asserts that La.Civ. Code Art. 2462 also renders invalid the parties’ unwritten agreement to sell the oyster bed leases. In pertinent part, that provision reads:
A promise to sell, when there exists a reciprocal consent of both parties as to the thing, the price and terms, and which, if it relates to immovables, in writing, so far amounts to a sale, as to give either party the right to enforce *785 specific performance of same. (Emphasis added).
Plaintiff responds that defendant’s admission under oath and delivery to plaintiff validated the transfer. La. Civ. Code Art. 2275 reads:
Every transfer of immovable property must be in writing; but if a verbal sale, or other disposition of such property, be made, it shall be good against the vendor, as well as against the vendee, who confesses it when interrogated on oath, provided actual delivery has been made of the immovable property thus sold.
It is crucial to distinguish between a contract of sale and a contract, or promise, to sell. The restrictions imposed upon immovable property in article 2275, and upon oyster leases specifically in R.S. 56:423(E), are placed upon the transfer itself — the contract of sale. As their contract stated, the parties looked to a final transaction at a later date. Theirs was a contract to sell. Concerning a writing requirement for im-movables, therefore, the only statutory provision appropriate to the present case is article 2462.
The writing requirement imposed by that provision, however, is not absolute. Paramount is that a written contract express the mutual intent of the parties to it. If that mutual intent is in question, extrinsic evidence, including parol evidence, will be admitted at trial to determine whether the written contract should be reformed to reflect the true intent of the parties.
The reformation of a contract for the sale of immovable property was at issue in Price v. Taylor, 139 So.2d 230 (La.App. 1st Cir.1962). The court summarized extensive case law on the subject:
Conceding that ordinarily parol evidence cannot be received to alter, vary or contradict the terms of a written instrument free from ambiguity, such rule, however, has no application where fraud or error is alleged. In these latter instances the rule is well established that where fraud or error is properly pleaded and it is made clearly to appear that through fraud or mistake the written instrument expresses a purpose different from that mutually agreed and intended by the parties, such mistake may be corrected and the writing reformed to express the true intention of the parties. The rule further requires that before such relief may be afforded there must be adduced clear proof of the different antecedent agreement as well as the error in committing it to writing. Ker, et al. v. Evershed et al., 41 La.Ann. 15, 6 So. 566. See also Carter Oil Company v. King, La.App., 134 So.2d 89, and cases therein cited. It is equally well established that the burden is on the one seeking reformation to prove the error alleged and that said onus must be discharged by clear proof of the strongest possible type. Reynaud v. Bullock, 195 La. 86, 196 So. 29; Carter Oil Company v. King, supra; Agurs v. Holt, 232 La. 1026, 95 So.2d 644; Cockerham v. Aime, La.App., 110 So.2d 238. See also Rodgers v. S.H. Bolinger Co., 149 La. 545, 89 So. 688; and Standard Oil Co. of Louisiana v. Futral, 204 La. 215, 15 So.2d 65.
At 234.
Even limiting our examination to written evidence additional to the contract, the accuracy of the terms of the written contract as an expression of the parties’ mutual intent comes into question. The newspaper advertisement taken by defendant offered an oyster lugger and oyster beds as a package deal. Plaintiff’s personal check bore plaintiff’s notation “Deposit for Oyster Bed and Boat” and was signed by plaintiff and endorsed by defendant.
Defendant’s actions and testimony demonstrated that he contracted with the same intent as plaintiff — to include both oyster lugger and leases.
Only days before the Act of Sale and assignment of leases were to be signed, while he was showing plaintiff’s son the oyster beds the young man was to farm, defendant spotted an oil well in the area of the oyster beds to be transferred to plaintiff. Defendant had never previously indicated any intent not to include the leases *786 with the sale of the boat and had omitted them from the July 1, 1981 document only because it “passed his mind.” Suddenly defendant could not be contacted and when he did reply to plaintiff’s requests to arrange for the signing of the final documents, it was to renege on that part of the agreement relating to the oyster beds. Plaintiff was prevented from transferring title over the oyster beds to himself, while defendant collected $29,400.00 in oil exploration damages for the oyster grounds, laying idle, that he had earlier agreed to sell to plaintiff. Defendant confessed under oath before the trial court that an agreement to sell the oyster beds had been made, and that the agreement was not reduced to writing due to mere oversight. We are convinced that this is “clear proof of the strongest possible kind,” Reynaud, et seq., supra, of the mutual error required for the reformation of this contract.
RECIPROCAL PERFORMANCE REQUIREMENT
Defendant asserts that, as the trial court ordered specific performance by defendant in the transfer of oyster leases, and payment of money damages amounting to $20,400.00 for the proceeds of the sale of the vessel to a third party ($15,000.00) and damage release money from seismograph operations $5,400.00), the trial court should also order specific performance of plaintiffs obligation under the agreement, the payment of $25,000.00.
The trial court ordered defendant to deliver to plaintiff the oyster beds, money damages representing the oyster lugger, and $5,400.00 in damage release money received by defendant after the transfers of the leases and vessel would have gone into effect had they not been prevented by defendant. We find that because plaintiff failed to prove any special damages caused by the breach of the promise to sell the vessel, which has been sold to a third party precluding specific performance, plaintiff’s relief is limited to specific performance of the promise to sell the oyster beds.
Since there is sufficient evidence in the record to determine the payment due a party, we do not find it necessary to remand to the trial court on this issue. Gonzalez v. Xerox Corporation, 320 So.2d 163 (La.1975).
The lump sum agreed upon for the leases and vessels was $25,000.00. Based upon the sum of $15,000.00 received by defendant for the subsequent sale of the vessel, the value of the leases along can be placed at $10,000.00. Plaintiff has already placed a $3,000.00 deposit on the property, leaving a sum due of $7,000.00.
At trial, defendant admitted that he received $12,000.00 from Ark-La. on February 26, 1982 as a crossing fee and damage release in connection with one of the leases purchased by plaintiff. Plaintiff, therefore, should have been awarded the $12,-000.00. Plaintiff is also entitled to the $5,400.00 awarded by the trial court, which had been paid to defendant for crossing fees in February, August, and September of 1982. Plaintiff, however, has not proved that he is entitled to recover any other of the fees collected by defendant.
For the foregoing reasons, the judgment of the trial court is amended to the extent that amount of the award in favor of plaintiff is reduced to the sum of $17,400.00 with legal interest from date of judicial demand until paid and is subject to a credit of $7,000.00. All costs of the appeal are taxed against plaintiff. In all other respects the judgment appealed from is affirmed.
AFFIRMED AND AMENDED IN PART.